## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRANCIS B. FREEMAN, JR. and MARNIE WALSKI MCMAHON, derivatively on behalf of TESLA, INC., | Case No. |
| Plaintiffs, | SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACHES OF FIDUCIARY DUTIES, AND UNJUST ENRICHMENT |
| vs. | |
| ELON MUSK, BRAD W. BUSS, IRA EHRENPREIS, ANTONIO J. GRACIAS, STEPHEN T. JURVETSON, ROBYN M. DENHOLM, and KIMBAL MUSK, | |
| Defendants. | DEMAND FOR JURY TRIAL |
| and | |
| TESLA, INC., | |
| Nominal Defendant. | |

By and through the undersigned counsel, Plaintiffs bring this shareholder derivative action on behalf of Nominal Defendant Tesla, Inc. ("Tesla" or the "Company") against certain current and/or former officers and directors of the Company for violations of law, including breaches of fiduciary duties, insider trading and misappropriation of information, unjust enrichment, and corporate waste, from at least June 21, 2016 to the present (the "Relevant Period"). Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, among other things: (a) a review and analysis of public filings made by Tesla, SolarCity Corporation ("SolarCity"), and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases, analyst reports, financial research, and other documents concerning the Company and SolarCity; (c) a review of news articles, shareholder communications, and postings on Tesla's website concerning the Company's public statements; and (d) a review of other publicly available information concerning Tesla, SolarCity, and the Individual Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.  In support of these derivative claims, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over all claims asserted herein pursuant to § 27 of the Securities Exchange Act of 1934 (the "1934 Act") for violations of §§ 14(a) and 20(a) of the 1934 Act and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

2.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual

who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant Tesla is incorporated in Delaware and has consented to jurisdiction in this Court.

## NATURE OF THE ACTION

4.      This is a shareholder derivative action brought on behalf of Nominal Defendant Tesla, against the Company's controlling shareholder, Elon Musk, and the Company's directors relating to breaches of fiduciary duties and violations of Sections 14(a) and 20(a) of the 1934 Act, which occurred in connection with Tesla's acquisition of SolarCity during the Relevant Period.

5.      As detailed herein, the Individual Defendants (defined below) breached their fiduciary duties as directors of Tesla by causing the Company to make materially false and misleading statements concerning the acquisition of SolarCity in 2016 (the "Acquisition") in the Form S-4 Joint Proxy Statement/Prospectus disseminated to Tesla's shareholders soliciting their vote in favor of the Acquisition.

6.      In an attempt to secure the support of Tesla's shareholders for the Acquisition, which was unfair to Tesla, the Individual Defendants caused Tesla to issue a materially false and misleading Joint Proxy Statement/Prospectus on Form S-4 with the SEC pursuant to § 14(a) of the 1934 Act. A Preliminary Proxy was filed on August 31, 2016 and, after the filing of several amendments, the final Joint Proxy Statement/Prospectus was filed with the SEC and disseminated to shareholders on October 12, 2016 (together, the "Proxy" or "Joint Proxy Statement/Prospectus"). The Proxy, which recommended that Tesla's shareholders vote in favor of the Acquisition, omitted and/or misrepresented material information in contravention of §§ 14(a) and 20(a) of the 1934 Act

and state law regarding the Acquisition, and the actual intrinsic value of the Company and of SolarCity.

7.    As explained herein, the foregoing information was material to the voting decisions of Tesla's shareholders regarding the Acquisition.  As such, defendants violated §§ 14(a) and 20(a) of the 1934 Act and breached their fiduciary duties under state law to maximize shareholder value and disclose all material information in connection with an acquisition transaction.  Defendants' violations of law caused significant damages to Tesla by causing Tesla to significantly overpay for SolarCity and acquire a company that was not a strategic fit for Tesla and which had significant debt and was spiraling into bankruptcy.  The Acquisition benefitted Elon Musk and the other Individual Defendants to the detriment of Tesla and its shareholders not affiliated with the defendants by salvaging their significant investments in SolarCity.

## PARTIES

8.    Plaintiff Francis B. Freeman, Jr. is, and has been at all times relevant hereto, a shareholder of Tesla. Plaintiff currently holds approximately 3,861 shares of Tesla stock and has continuously held Tesla stock since September 2015.

9.    Plaintiff Marnie Walski McMahon is, and has been at all times relevant hereto, a shareholder of Tesla. Plaintiff currently holds approximately 25 shares of Tesla stock and has continuously held Tesla stock since May 2013.

10.    Nominal Defendant Tesla is a Delaware corporation headquartered at 3500 Deer Creek Rd., Palo Alto, California 94070.  Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA."

11.    Defendant Elon Musk is and was at all relevant times Tesla's co-founder and a director of the Company.  Elon Musk was also Chairman of SolarCity prior to its acquisition by

Tesla.  Musk is also the cousin of SolarCity's founders – Lyndon and Peter Rive.  During the Relevant Period, Elon Musk owned between 26.5% and 29% of Tesla's stock; his ownership percentage of Tesla decreased to 22.5% after he sold stock in a May 25, 2016 offering, and was 18.4% in September 2016.  As a result of Tesla's acquisition of SolarCity, Musk received over half a billion dollars of Tesla stock in exchange for his SolarCity shares.   Musk has also served as CEO, Chief Technology Officer and Chairman of the Board of SpaceX since 2002.  Tesla's annual proxy statements admit that Musk is not an independent director.

12.     Defendant Brad W. Buss has served as a director of Tesla since 2009. He retired as the Chief Financial Officer of SolarCity in February 2016, and served as a consultant to SolarCity until December 31, 2016.  During the Relevant Period, Buss owned 37,277 shares of SolarCity stock.  According to Tesla's 2014 Proxy Statement, Buss served on Tesla's Audit, Compensation and Nominating Governance Committees.  However, when Buss joined SolarCity, he resigned from all three committees, and Tesla's Proxy states that Buss is not independent.  Buss currently does not have full-time employment, and earned $4,954,785 as a director of Tesla in 2015.  Buss also earned $32 million during the 18 months he served as CFO of SolarCity.  Buss also previously served as the Executive Vice President of Finance and Administration and Chief Financial Officer of Cypress Semiconductor Corporation from 2005 to 2014.   Mr. Buss also held prior financial leadership roles with Altera Corporation, Veba Electronics LLC and Wyle Electronics, Inc. Mr. Buss also serves as a director for Advance Auto Parts, Inc. and Cavium, Inc. Mr. Buss was born in Canada and holds a B.A. in economics from McMaster University and a business degree from the University of Windsor.

13.     Defendant Ira Ehrenpreis has been a director of Tesla since 2007.  He has also been a managing partner and co-owner, since 2014, of DBL Partners, which he co-founded with Nancy

Pfund, who was a member of the SolarCity Board.  Pfund, who owned 1.5% of SolarCity's stock, was one of the two members of SolarCity's Special Committee that was formed to negotiate and approve Tesla's acquisition of SolarCity.  Ehrenpreis has also been a General Partner with Technology Partners since 1996.  Defendant Ehrenpreis earned $ 7,239,683 as a director of Tesla in 2015.

14.     Defendant Antonio J. Gracias has served on the Tesla Board since May 2007. Gracias beneficially owns 211,854 shares of SolarCity stock.  Gracias is the founder, managing partner, CEO, Chief Investment Officer, director and sole owner of private equity firm Valor Management Corp., d/b/a Valor Equity Partners ("Valor").  Defendant Gracias has served as Tesla's purported "Lead Independent Director" since September 2010.  Mr. Gracias is a director of SpaceX and SolarCity. Mr. Gracias holds a joint B.S. and M.S. degree in international finance and economics from the Georgetown University School of Foreign Service and a J.D. from the University of Chicago Law School.  Defendant Gracias earned $9,790,505 as a director of Tesla in 2015.

15.     Defendant Stephen T. Jurvetson has served on the Tesla Board since June 2009. Jerveston owns 417,450 shares of SolarCity stock. He is a member of the Tesla Board's Audit Committee.  In fiscal year 2015, Jurvetson earned $6,095,984 as a Tesla director.  Jurvetson is a managing director of venture capital firm Draper Fisher Jurvetson ("DFJ"). Another managing director of DFJ, John H.N. Fisher ("Fisher"), is a director of SolarCity. DFJ invested in Tesla before its 2010 initial public offering ("IPO"), participating in Tesla's Series C (closed May 1, 2006), Series D (closed May 11, 2007), and Series E (closed February 8, 2008) venture funding rounds. DFJ also invested in several of SolarCity's pre-IPO venture funding rounds. Funds managed by DFJ

beneficially owned 3,308,266 shares of SolarCity's common stock — approximately 3.3% of shares outstanding prior to the Acquisition.

16.     Defendant Robyn M. Denholm has been a member of Tesla's Board of Directors since August 2014. From July 2013 until February 2016, Ms. Denholm served as Executive Vice President and Chief Financial and Operations Officer of Juniper Networks, Inc.  Prior to joining Juniper, Ms. Denholm served in various executive roles at Sun Microsystems, Inc. from January 1996 to August 2007, including Senior Vice President of Corporate Strategic Planning, Senior Vice President of Finance, and Vice President and Corporate Controller (Chief Accounting Officer). Ms. Denholm also served at Toyota Motor Corporation Australia for seven years and at Arthur Andersen & Company for five years in various finance assignments. Ms. Denholm is a Fellow of the Institute of Chartered Accountants of Australia and holds a Bachelor's degree in Economics from the University of Sydney and a Master's degree in Commerce from the University of New South Wales. In fiscal year 2015, Denholm earned $ 4,979,785 as a Tesla director.  Denholm does not appear to currently have full-time employment, and thus her Tesla director fees are her principal source of income.

17.     Defendant Kimbal Musk has served on the Tesla Board since April 2004. He is the brother of Elon Musk and cousin of Lyndon and Peter Rive. Tesla admits in its SEC filings that Kimbal Musk is not an independent director of the Company.  In fiscal year 2015, Kimbal Musk earned $ 4,964,381 as a Tesla director. Kimbal Musk beneficially owns 147,541 shares of SolarCity common stock. The vast majority of his holdings in Tesla and SolarCity are pledged as collateral to secure personal indebtedness. Kimbal Musk is a director of SpaceX. Kimbal Musk is also a limited partner of Valor Equity Partners II, L.P. (in which his brother has also invested) and Valor Equity Partners III-A, L.P., both of which are funds advised by Valor.

18.     The defendants named above in ¶¶ 11-17 are sometimes collectively referred to herein as the "Individual Defendants."

## THE ACQUISITION

19.     SolarCity is one of three companies founded and controlled by Defendant Elon Musk. The other two are Tesla and SpaceX.  Solar City primarily leases solar panel equipment to residential and commercial customers. The lease payments provide SolarCity with its main source of revenue. SolarCity relies on debt to finance its up-front costs associated with equipment and installation.

20.     Prior to its recent Acquisition by Tesla, SolarCity had consistently failed to turn a profit, had mounting debt, and was burning through cash at an unsustainable rate. During its ten-year history, SolarCity had accumulated over $3 billion in debt, nearly $1.5 billion of which was scheduled to become due before the end of 2017.  During this time, SolarCity generated just over $1.6 billion in total revenue. As of August 9, 2016, SolarCity had cash and cash equivalents of just $145.7 million, which was then supplemented through a $305 million "cash equity" transaction announced on September 12, 2016.

21.      By comparison, SolarCity incurred operating losses of $768 million in 2015 and $533 million during the first half of 2016, while forecasting additional losses between $240 million and $250 million for the fourth quarter of 2016. In the third quarter of 2016, the final quarter SolarCity operated as an independent company, SolarCity had $257.7 million in operating costs, including $204.2 million of SG&A and R&D expenses. SolarCity ended 2016 with full-year operating expenses of over $901 million.

22.     Despite SolarCity's bleak future, on June 21, 2016, Tesla announced an offer to acquire SolarCity at a significant premium.  Tesla's original offer proposed an exchange ratio of 0.122x to 0.131x shares of Tesla common stock for each share of SolarCity common stock,

00374952                         - 7 -

representing a value at the time of $26.50 to $28.50 per share, or a premium of approximately 21% to 30% over the closing price of SolarCity's shares, based on Tesla's closing stock price as of June 20, 2016 and the 5-day volume weighted average price of Tesla shares.

23.     SolarCity had been kept afloat during the year preceding the Acquisition largely through related-party transactions.  Among the most prominent of the related-party transactions was the purchase of $100 million in solar bonds issued by SolarCity by Elon Musk and his relatives.  The significant increase in the funding of SolarCity through related-party transactions is reflected in the chart below which, among other things, reflects the significant increase in such funding from 2015 to 2016:

SolarCity's related party balances were comprised of the following (in thousands):

| | September 30, 2016 | | December 31, 2015 | |
|---|---|---|---|---|
| Due from related parties (included in accounts receivable) | $ | 22 | $ | 30 |
| Due to related parties (included in accounts payable) | $ | 1,080 | $ | 3,961 |
| **Solar bonds issued to related parties** | **$** | **265,200** | **$** | **165,220** |
| Convertible senior notes issued to related parties | $ | 12,978 | $ | 12,975 |
| Due to related parties (included in accrued and other current liabilities) | $ | 1,578 | $ | 1,249 |

24.     Having personally funded SolarCity in unusually large amounts, Musk and his relatives and business partners had a huge personal incentive to salvage such investments.[1]  This incentive was not shared by Tesla's public shareholders who did not own stock or bonds in SolarCity.  Thus, the Acquisition was essentially a bailout of SolarCity, which absent the Acquisition would have faced a significant chance of bankruptcy in the near future. The bailout of

---

[1] In an April 27, 2016 interview with the Wall Street Journal, Musk admitted that Tesla, SolarCity and SpaceX are all important and related companies to him, and that it is "important that there not be some sort of house of cards that crumbles if one element of the pyramid of Tesla, SolarCity and SpaceX falters."  *See* Susan Pulliam, "Elon Musk Supports His Business Empire With Unusual Financial Moves," THE WALL STREET JOURNAL, April 27, 2016.

SolarCity benefitted the following six of the seven members of the Tesla Board and/or their family members, businesses and business partners: (a) defendant Elon Musk, his brother and cousins; (b) defendant Antonio J. Gracias ("Gracias") and funds he manages;  (c) defendant Kimbal Musk, his brother and cousins; (d) defendant Stephen T. Jurvetson ("Jurvetson"), his venture capital firm, and his firm's managing director; (e) the venture capital partner of defendant Ira Ehrenpreis ("Ehrenpreis"); and (f) defendant Brad W. Buss ("Buss").  In addition to having strong personal and financial ties to Elon Musk and SolarCity, all of the above individuals were substantial SolarCity stockholders prior to the Acquisition.

25.    The Tesla Board did not form a special committee of independent directors to evaluate the Offer or the Acquisition. Instead, Elon Musk and Gracias, both of whom serve on both the SolarCity Board and the Tesla Board, merely recused themselves from Tesla Board votes relating to the Acquisition. This recusal was superficial, however, as both Elon Musk and Gracias participated in Tesla Board discussions and negotiations regarding the Acquisition. Moreover, even setting Elon Musk and Gracias aside, the remaining members of the Tesla Board have disabling conflicts and therefore could not disinterestedly and independently consider the Acquisition.

26.    The June 21, 2016 offer to acquire SolarCity was addressed to Musk's cousin, Lyndon Rive, and stated:

> Mr. Lyndon R. Rive
> Chief Executive Officer
> SolarCity Corporation
> 3055 Clearview Way
> San Mateo, CA 94402
>
> Dear Lyndon:
>
> We are pleased to submit to you and the SolarCity board of directors a proposal to acquire all of the outstanding shares of common stock of SolarCity in exchange for Tesla common shares.  Subject to completing due diligence, we propose an exchange ratio of 0.122x to 0.131x shares of Tesla common stock for each share of SolarCity

common stock. *This proposal represents a value of $26.50 to $28.50 per share, or a premium of approximately 21% to 30% over the closing price of SolarCity's shares,* based on today's closing price of SolarCity's shares and the 5-day volume weighted average price of Tesla shares. We believe that our proposal offers fair and compelling value for SolarCity and its stockholders, while also giving SolarCity's stockholders the opportunity to receive Tesla common stock at a premium exchange ratio and the opportunity to participate in the success of the combined company through their ongoing ownership of Tesla stock.

The board of directors of Tesla is excited at the prospect of a potential combination of SolarCity's business with Tesla. We believe that the possibilities for product, service and operational synergies would be substantial, and that a combination would allow our companies to build on our respective core competencies and remain at the forefront of delivering innovative approaches for sustainable transportation and energy. *We believe that a combination would generate significant benefits for stockholders, customers and employees of both Tesla and SolarCity.*

We are committed to a possible transaction that is fair to SolarCity's and Tesla's respective stockholders. To help ensure that, *Tesla is prepared to make the consummation of a combination of our companies subject to the approval of a majority of disinterested stockholders of both SolarCity and Tesla voting on the transaction. In addition, as a result of their overlapping directorships, Elon Musk and Antonio Gracias have recused themselves from voting on this proposal at the Tesla board meeting at which it was approved, and will recuse themselves from voting on this proposal at the SolarCity board as well.* We believe that any transaction should be the result of full and fair deliberation and negotiation by both of our boards and the fully-informed consideration of our respective stockholders.

Our proposal is subject to the satisfactory completion of due diligence, the negotiation of mutually agreeable definitive transaction documents, and final approval by the Tesla board. While a transaction would be further subject to customary and usual closing conditions, we believe that Tesla is well positioned to negotiate and complete the transaction in an expedited manner. We do not anticipate significant regulatory or other obstacles in consummating a mutually beneficial transaction promptly.

In light of Elon Musk's SEC disclosure obligations in his individual capacity as a stockholder of SolarCity this proposal will be publicly disclosed, but Tesla's intention is to proceed only on a friendly basis.

We look forward to discussing a potential transaction with you, and hope to expeditiously enter into a definitive agreement.

Sincerely,

The Board of Directors of Tesla Motors, Inc.

27.     On June 27, 2016 SolarCity announced that SolarCity's Board of Directors had formed a special committee of independent directors to evaluate the June 20, 2016 Tesla Offer. The special committee was composed of Donald R. Kendall, Jr. and Nancy E. Pfund. Mr. Kendall served as chair of the special committee. The special committee retained Skadden, Arps, Slate, Meagher & Flom LLP as its legal counsel and Lazard Frères & Co. LLC ("Lazard") as its financial advisor to assist in its review.

28.     Musk knew that Tesla's proposal was riddled with irreconcilable, substantial, and material conflicts of interest, and that he should recuse himself from all deliberations regarding what was, in effect, his own offer to use Tesla's cash to salvage his investment in SolarCity.  Musk knew that at least a majority of all SolarCity and Tesla directors, if not all such directors, also had irreconcilable conflicts that would prevent them from independently and objectively considering the Tesla offer.

29.      Prior to recusing themselves from deliberations concerning the Tesla offer, however, Musk and his associates tilted the playing field in Musk's favor.

30.     Musk's disclosure of the Tesla Offer was met with criticism from the financial markets due to Musk's substantial interest in saving his declining investment in SolarCity.  Fortune stated:

> "Critics panned the deal as everything from a "corporate governmental mess" to "the corporate form of a West Virginia wedding." Between Musk's personal financial interests in each company and the overlap between Tesla and SolarCity's boards—with few directors who aren't either related to Musk by blood or have ties to both companies—investors weren't sure whether the acquisition was really in their best interest. Tesla's stock price fell more than 10% during the day. "We expect a robust shareholder fight over this acquisition centered on corporate governance," Oppenheimer analyst Colin Rusch wrote in a research note as he downgraded Tesla stock to neutral."

*See* Jen Wieczer, "Tesla Quietly Changed Its Bylaws to Ward Off SolarCity Shareholder Fight,"

FORTUNE, June 23, 2016.

31.    While Musk had SolarCity appoint a special committee to vet the proposal, he was

unabashed in stating that the deal was a *fait accompli* and that he and the other directors who had

recused themselves from voting would nonetheless continue to participate in board discussions

concerning the Tesla Offer, thus continuing their improper influence.

32.    For example, on a call with analysts to discuss the Acquisition, Tesla told analysts

that Musk and the other conflicted directors "will still be in the room and participating in the board's

discussion of the deal."  *See* Jen Wieczer, "Why Tesla and SolarCity Have an Elon Musk Problem,"

FORTUNE, June 22, 2016.  The following is a quote from the conference call Tesla conducted with

analysts on June 22, 2016:

**Todd Maron (Tesla Motors, Inc.):**

So this is Todd. When, this is a little bit tracks back to what I was saying earlier
about this stage of the process that we're in, but when a deal is announced if that
happens all this stuff will come out in terms of exactly what the process was at every
point. The key points now are that *Elon and Antonio since they are on both boards
have recused themselves from the board process of voting on the transaction*. And
they've also committed to if there's a deal that the disinterested shareholders would
vote on that deal with the majority of those disinterested shares determining the
outcome of the vote. But beyond that it's really too early in the process to get into all
the different details but rest assured that will all come out once there is actually a
definitive agreement that's reached. At this point, it's probably more appropriate to
just focus on the business rationale for why this deal makes sense.

**Brian Johnson (Barclays Capital):**

And just when you say recused from voting does that also mean recused from
discussion and not present in the room when this was brought up?

**Todd Maron (Tesla Motors, Inc.):**

*No, it was recused from voting.*[2]

---

[2] *See* Form 425 filed by Tesla with the SEC on June 23, 2016.

33.     Furthermore, when asked during the June 22, 2016 conference call "how independent do you consider the remaining directors; do they have any personal ownership of SolarCity and the other things that are likely to relate to the Board issues," Mr. Maron of Tesla refused to answer the questions, stating that it was "really too early in the process to get into all the different details. . . . it's probably more appropriate to just focus on the business rationale for why this deal makes sense."

34.     Moreover, Musk made numerous public comments to let the Tesla Board members know how they were supposed to vote, in case there was any doubt.  For example, he stated that "The board opinion is unanimous at both companies [to approve the deal]."  *See id.*  Musk also made several statements that the benefits of the Acquisition were "blindingly obvious" and a "no-brainer."  *See* Steven Davidoff, "Tesla's Plan to Buy SolarCity Has Major Flaws," THE NEW YORK TIMES, June 22, 2016.

35.     Meanwhile, Musk and the other defendants were using their control of Tesla to further their own financial interests by continuing to negotiate a friendly deal with SolarCity.  Those negotiations were successful, just as Musk had predicted, and on August 1, 2016, Tesla and SolarCity announced that they had entered into an Agreement and Plan of Acquisition dated July 31, 2016 (the "Acquisition Agreement"), which set forth the terms of the Acquisition. Under the Acquisition Agreement, each share of SolarCity common stock issued and outstanding was to be converted into the right to receive 0.110 shares of Tesla common stock. The Acquisition was valued at $2.6 billion or $25.37 per share of SolarCity stock based on the five-day volume weighted average price of Tesla shares as of July 29, 2016 (*i.e.*, the last trading day prior to the announcement of the Acquisition). The Acquisition was expected to close in November 2016, following stockholder votes at Tesla and SolarCity, and did in fact close on or about November 21, 2016.

36.     After announcing the offer, the Individual Defendants knew, but the market failed to fully appreciate, that SolarCity was burning cash faster than it had disclosed.  On August 23, 2016, Elon Musk and the Rives personally bought $100 million in SolarCity bonds in order to help buoy interest in the bonds.  These bonds mature on February 17, 2018 and will be repaid by Tesla, with Tesla also paying 6.5% interest semi-annually through that date.  Musk and the Rives knew about SolarCity's dire financial position at the time but concealed the full extent of it from the market when they caused Tesla to issue the misleading Proxy, as indicated below.

### MUSK AND OTHERS HAD AN IRRECONCILABLE CONFLICT IN CAUSING TESLA TO ACQUIRE SOLARCITY AT AN INFLATED PRICE

37.     Many large investors in SolarCity, such as Valor, DFJ, and DBL Partners, are also heavily invested in and hold seats on the boards of Musk's other enterprises, including Tesla and SpaceX.  If Elon Musk were to allow the SolarCity prong of his pyramid to default, resulting in his frequent investors receiving pennies on the dollar in bankruptcy, it is less likely that those investors would be willing to contribute additional capital for Tesla, SpaceX or any future ventures. By exchanging SolarCity stock for Tesla stock, Elon Musk saved these favored investors from large losses.

38.     Furthermore, causing Tesla to bail out SolarCity, thus avoiding SolarCity's bankruptcy and a complete loss of investors' money, protected Elon Musk's reputation, as well as his ego. The Acquisition helped preserve Musk's reputation and ability to raise capital in the future for all his businesses.

39.     As a result, the Acquisition was intended to, and did, benefit Elon Musk, his brother, his cousins and their affiliates, and certain Tesla directors at the expense of the Company and its minority stockholders.  On the surface, it would seem that a transaction that would be harmful to Tesla would generally be most damaging to Elon Musk, as he is Tesla's largest stockholder with

approximately 18.4% of the Company's outstanding shares as of September 15, 2016.  However, that is inaccurate here because any dilution of his Tesla stock was offset by the rescue of the SolarCity stock and bonds he owns. Indeed, the Acquisition resulted in a net increase in Elon Musk's ownership of Tesla common stock. Further, Elon Musk will have the opportunity to increase his ownership interests going forward because his compensation as the Company's CEO consists almost exclusively of Tesla stock options.

### THE MATERIALLY MISLEADING PROXY

40.     To convince Tesla's shareholders to approve the acquisition of SolarCity, the Individual Defendants caused Tesla to disseminate a false and misleading Joint Proxy Statement/Prospectus dated October 12, 2016.  To make SolarCity look more attractive, Tesla's officers and directors manipulated the valuation analyses of both Tesla and SolarCity, failed to disclose numerous significant facts regarding SolarCity's operations and the full extent of SolarCity's cash drain and the effect it would have on Tesla after the Acquisition, and many other material facts concerning the Acquisition.

41.     Specifically, the Proxy omitted/or misrepresented the material information set forth below in contravention of §§ 14(a) and 20(a) of the 1934 Act and/or defendants' duty of candor and full disclosure under state law:

**The Proxy Ascribed False and Misleading Reasons for the Acquisition**

42.     The Proxy stated that the reason for the Acquisition was to "operate more efficiently" and "achieve efficiencies" of at least $150 million from combining Tesla and SolarCity:

Q:     What is the strategic rationale for combining Tesla and SolarCity at this time?

A:     Tesla and SolarCity both believe that this is an opportune time to combine *in order to operate more efficiently and fully integrate our products*, while providing customers with an aesthetically beautiful and simple one-stop solar and energy

storage experience. ***The Combined Company is expected to achieve approximately $150 million in cost synergies in the first full year after closing***, and save customers money, by lowering hardware costs through consolidation of supply chains, reducing installation costs, improving the Combined Company's manufacturing efficiency and reducing its customer acquisition costs. Additionally, ***the Combined Company will generate cost savings from not having to operate on an arm's-length basis in affiliate transactions***.

43.     This statement, which was highly material because it went to the very reason for conducting the Acquisition, was false and misleading since the real reason for the Acquisition was to salvage the substantial investment of Elon Musk and other investors in SolarCity.

44.     The representation that the main purpose of the Acquisition was to create efficiencies was false because Tesla did not need to buy SolarCity to try to create any efficiencies in whatever business the two companies wanted to do together.  *See, e.g., In re Emerging Commc'ns, Inc. S'holder Litig.*, 2004 Del. Ch. LEXIS 70, at **48-49 (Del. Ch. May 3, 2004) ("Because Prosser controlled both ECM and ICC, he had the power to accomplish those savings without a business combination, such as by intercompany contractual arrangements.").  Most tellingly, however, when questioned about this representation, Tesla never could explain how it planned to create at least $150 million in synergies from trying to meld together two companies so disparate as an electric car company and a solar panel company.  The failure of Tesla to provide any details or meaningful answer to this question demonstrates that Tesla's representation that the main purpose of the Acquisition was to create efficiencies, synergies, and cost savings was false when asserted in the Proxy.  For example, Elon Musk himself knew the statement was false because he was not able to answer analyst questions about the representation.  On a conference call with analysts to discuss the announcement of the Acquisition, Elon Musk suggested that an estimate of $150 million to $200 million in synergies was "conservative." However, when pressed for further detail on this estimate and whether it could be broken down quantitatively, Tesla representatives were unable to

- 16 -

substantiate it, stating only that "[r]ight now we're not assigning the $150 million at any lower level of detail than that."

45.     In addition, many industry analysts have questioned the viability of the projected synergies and view the Acquisition as a Tesla-financed bailout for SolarCity and its stockholders:

a.     Barclays analyst Brian Johnson issued a note in response to Tesla's claim of substantial expected synergies, saying that he sees "little in the way of synergies and much in the way of cash burn."

b.     In a June 25, 2016 article entitled "Tesla, SolarCity Look Like a Bad Fit," Bill Alpert and Travis Arbon of Barron's and Dow Jones & Company said: "Musk envisions Tesla-store visitors picking up a $40,000 car, a $10,000 battery backup system, and a 20- year solar contract in one trip. That's implausible. He confessed on Wednesday's conference call that he had no idea how much overlap there is between Tesla car buyers and SolarCity homeowners, and we suspect that most thrift-minded solar-lease customers will find even Tesla's cost-reduced Model 3 car unaffordable whenever it rolls out."

c.     Duncan Meaney, a financial adviser and portfolio manager at the Social Equity Group, was quoted as follows: "It does raise the suspicion that this is a way to bail out Solar City, which is a fairly significant money-losing operation.

d.     On August 1, 2016, UBS published a research report titled "Tesla & SolarCity: Deal Synergies Still Cloudy," in which the author stated "The company provided limited financial quantification of the $150m cost synergies" and only "vague cost savings goals."  The research report also noted that "Current disclosures in the Acquisition agreement suggest cost savings will come from lower hardware, reduced installation, improved manufacturing, and reducing customer acquisition costs, though we are unsure how much of that would come from synergies versus previously planned cost reduction."

e.     Angelo Zino, an analyst at S&P Global Market Intelligence, was quoted in an online Bloomberg article as follows: "This deal has everything to do with debt. Call it a bailout, call it what you will … SolarCity is one bad economic downturn away from going belly up."

46.     The Proxy was also false and misleading for failure to disclose the quantity of expected synergies past year one.  Moreover, the financial information and modeling underlying the

Case 1:17-cv-00317-VAC-CJB  Document 1  Filed 03/24/17  Page 19 of 60 PageID #: 19

year one synergies are not provided in the Proxy. Furthermore, the Estimated Synergies were not incorporated into the financial analyses of Evercore Partners.

**The Proxy Contained a False and Misleading Fairness Opinion From Evercore Partners**

47.     Evercore Partners ("Evercore") served as Tesla's financial advisor and provided a fairness opinion regarding the Acquisition.  As the Proxy states:  "On July 30, 2016, Evercore delivered to the Tesla Board its oral opinion, confirmed by its delivery of a written opinion dated July 30, 2016, that, as of the date thereof and subject to the assumptions, limitations, qualifications and conditions set forth in its opinion, the Acquisition consideration was fair, from a financial point of view, to Tesla."

48.     The Proxy was false and misleading because it failed to disclose numerous material facts about Evercore's Fairness Opinion and underlying methodology, data inputs, and conclusions.

49.     Evercore's Fairness Opinion was deficient and highly misleading because it failed to utilize or disclose the financial projections prepared by Tesla's management.  Under Delaware law, absent compelling reasons, an investment banker should use the most updated and accurate management projections when preparing a fairness opinion. Such projections existed but were not used by Evercore and were not disclosed in the Proxy.  Moroever, the Proxy conspicuously fails to state any compelling reason why forecasts from Tesla's management were not used or disclosed.[3]

50.     Instead, in determining that the Acquisition exchange ratio was "fair," Evercore used projections for Tesla for 2016-2020 financial results developed by Goldman Sachs Equity Research on the basis of only publicly-available information.  SolarCity's financial advisor, in

---

[3] Absent a complete abdication of their fiduciary duties, Tesla's directors could not have voted in favor of the Acquisition without having prepared and reviewed pro forma forecasts showing what the effect of the acquisition of SolarCity was expected to be on Tesla's future financial results. Since such pro forma financial forecasts must have been prepared, and presumably were relied upon by Tesla's directors in determining that the Acquisition was in the best interests of Tesla's shareholders, they should have been disclosed in the Proxy.

00374952                                  - 18 -

contrast, used financial projections for SolarCity prepared by SolarCity's management.  It is highly

unusual for an investment banker to not use management's own projections when it has access to

them, since a company's management is obviously the best and most accurate source of information

about the company's expected future projections and cash flows.  The Proxy admits that Evercore

worked closely with Tesla management on the acquisition of SolarCity and preparation of its

Fairness Opinion, but the Proxy never explains why Tesla management did not provide Evercore

with management's financial projections.[4]  The Proxy never explained why Evercore used only

Goldman Sachs' publicly-available projections instead of the non-public projections prepared by

Tesla's own management.  Because expected future cash flows are the most critical and reliable

input in arriving at a reliable present value for a company's fair value, Evercore's unexplained and

unusual decision to not utilize Tesla's internal financial projections rendered its analysis misleading

and inaccurate.

     51.    The Proxy was additionally false and misleading with respect to the failure to disclose

why Evercore did not use Tesla's own financial forecasts because it contained numerous discussions

of instances where Evercore discussed Tesla's future operations, thus misleadingly suggesting that

Evercore had taken into consideration guidance from management when in fact no forecasts had

been provided to Evercore.  For example, the Proxy states at p. 75 that Evercore: "reviewed the

Goldman Sachs equity research model for Tesla published on July 6, 2016 (the "GSER Forecasts")

---

[4] The Proxy states, for example:  "Between June 5 and June 20, 2016, representatives of Evercore
worked with Tesla management to conduct a preliminary financial analysis of certain strategic and
financial alternatives in the solar energy industry available to Tesla, including a potential acquisition
of SolarCity."  The Proxy also states that "during the weeks beginning on July 4, 2016 and July 11,
2016, members of Tesla management and representatives of Evercore met numerous times with
members of SolarCity management and representatives of Lazard to discuss the forecasts and the
operating and financial assumptions employed by SolarCity management to prepare such forecasts,
as well as SolarCity's financial results, cash position."  The Proxy does not explain why Evercore
reviewed SolarCity's financial projections as part of its work but never reviewed Tesla's financial
forecasts.

and discussed with Tesla management how the GSER Forecasts compared to their expectations with respect to the future operating and financial performance of Tesla."

52.     The Proxy further states at p. 76:

> ***Tesla did not provide Evercore with an internal projected financial model or any other projected financial or operating data with respect to Tesla. Instead***, following discussions with Evercore as to how certain public forecasts compared to Tesla management's expectations with respect to the future financial and operating performance of Tesla, and ***after confirming to Evercore that the GSER Forecasts were a reasonable estimate of Tesla's future financial and operating performance in light of management's expectations, Tesla instructed Evercore to utilize the GSER Forecasts for that purpose***.

53.     This statement was false and misleading because it implied that the Goldman Sachs forecasts were the same or very similar to internal projections prepared by Tesla, when this was not necessarily the case.  While the Proxy states that Tesla management purportedly discussed with Evercore how the GSER Forecasts compared to their expectations with respect to the future operating and financial performance of Tesla, these comparisons and expectations are not disclosed in the Form S-4. As set forth above, in this manner, the drafters of the Proxy artfully avoided disclosing Tesla Management's own internal forecasts, while pointing to them (indirectly) as a means to bolster the reliability of, and justify the reliance on, the GSER Forecasts. When Tesla told Evercore that it believed the Goldman Sachs Equity Research numbers "were a reasonable estimate of Tesla's future financial and operating performance," that did not necessarily mean they were the same.[5]  The estimates could have been significantly different than Tesla's internal projections.  Tesla could have determined that the Goldman Sachs numbers were "reasonable" because they were based

---

[5] The Proxy was also false and misleading by stating that Evercore had discussed the GSER Forecasts with Tesla's management, but not disclosing that Goldman Sachs' analysts did not have access to the internal Tesla information that Goldman Sachs' investment bankers did.  Goldman Sachs was Tesla's main investment banker prior to the Acquisition.  Its investment bankers had access to Tesla's projections but its analysts did not since the two departments are subject to a Chinese wall to avoid conflicts.

on non-public information, and yet still lower than management's projections since management's projections were based on non-public information that incorporated more recent information. Simply put, there was no logical reason why Tesla management would play "hide the ball" with Evercore other than out of a desire to have Evercore use more conservative numbers in order to attempt to make the SolarCity acquisition look more reasonable.  Because it was a stock-for-stock Acquisition, higher projections for Tesla would have caused Evercore's analysis to reflect that the Acquisition consideration was more dilutive and/or unfair to Tesla shareholders.

54.     To make matters more confusing (and obscure the fact that Evercore was not given Tesla management's financial projections), for purposes of its discounted cash flow analysis, Evercore also used Institutional Brokers' Estimate System ("IBES") estimates of Tesla's value as of July 29, 2016.  Based on the GSER Forecasts, Evercore determined an implied per share equity value reference range for Tesla on a standalone basis of approximately (a) $200.83 to $311.66 using the EBITDA multiple method and (b) $88.36 to $302.21 using the perpetuity growth rate method. Using the IBES Forecasts and adjusting for debt outstanding as of March 31, 2016 and cash as of March 31, 2016, Evercore determined an implied per share equity value reference range for Tesla on a standalone basis of approximately (a) $295.44 to $459.93 using the EBITDA multiple method and (b) $132.92 to $451.02 using the perpetuity growth rate method. *See* Proxy at p. 81.  These valuation ranges were so wide and different as to be worthless.  Stockholders, however, were not informed as to Tesla's actual financial projections or the valuation ranges that such projections yield.

55.     Likewise, in its discounted equity value analysis, Evercore also utilized IBES estimates for Tesla that projected wildly disparate estimated net income for calendar year 2020 (as compared to the GSER Forecasts). The differences in the GSER Forecasts and IBES estimates yielded materially different calculations of implied value per Tesla share ($121.70-$161.52 (using

GSER Forecasts) and $199.41-$265.88 (using IBES)). Again, the Proxy was misleading for disclosing these numbers but not disclosing a much more reliable and relevant number – Tesla's own financial projections.

56.    In addition, the Proxy was misleading for omitting to disclose: (1) whether Goldman Sachs, which was Tesla's investment bank in 2016, prior to the Acquisition, had any input into or influence over Tesla's selection of Evercore for the Transaction; (2) whether Goldman Sachs had any role in the estimation of SolarCity's forecast which was used in the Proxy; and (3) how and why Tesla used projections for its 2016-2020 expected financial results developed by Goldman Sachs Equity Research.

57.    For its analysis of SolarCity, in contrast, Evercore relied upon projections created by SolarCity's own management.

58.    Significantly, as explained below, despite the fact that SolarCity's management generated two sets of projections (one of which generated a higher value based on the assumption that SolarCity would have enough liquidity, and the second of which contained a lower value based on the more realistic assumption that SolarCity's access to capital would be impeded), Evercore only used the higher projections to value SolarCity even though SolarCity's own banker Lazard used both sets of projections.[6]

59.    Lazard performed two Discounted Cash Flow ("DCF") analyses, both of which relied upon projections created by SolarCity's own management.  The first DCF analysis relied on a SolarCity management forecast provided to Evercore in mid-July 2016, which forecast the Proxy

---

[6] While the Proxy states that Evercore was only initially provided with a copy of the SolarCity Unrestricted Liquidity Case projections, it also states that Evercore was subsequently provided with a copy of the SolarCity Liquidity Management Case projections and discussed them with Tesla at a special board meeting on August 25, 2016.  Despite being provided with a copy of the second set of projections, Evercore refused to modify its fairness opinion in any way or consider the second set of projections, despite knowing that Lazard had used the second set in its work.

refers to as the "SolarCity Unrestricted Liquidity Case." Those projections resulted in a higher valuation for SolarCity because they assumed SolarCity would have enough liquidity to fund operations.  The second set of projections provided by SolarCity to Lazard were called "SolarCity Liquidity Management Case" and resulted in lower valuations because they were based on the reasonable assumption that SolarCity would have liquidity problems.

60.     When SolarCity's financial advisor, Lazard, performed DCF analyses utilizing the SolarCity Liquidity Management Case, Lazard derived per share value ranges for SolarCity falling entirely below the Acquisition price. Specifically, Lazard's initial DCF analysis based on the SolarCity Liquidity Management Case calculated a "per-share equity value reference range for SolarCity of approximately $6.75 to $19.25." After correcting for a supposed "computational error," which the Proxy claims "double-counted SolarCity's projected outstanding indebtedness of $400 million under its revolving credit facility," Lazard's DCF analysis based on the SolarCity Liquidity Management Case yielded values for SolarCity of only "$10.50 to $23.25" per share (41% to 91% of the acquisition price).  As explained above, the Acquisition price is $25.37 per share of SolarCity stock based on the five-day volume weighted average price of Tesla shares as of July 29, 2016 (*i.e.,* the last trading day prior to the announcement of the Acquisition), or $25.83 per SolarCity share if based on the closing price of Tesla's shares as of that date.

61.     Inexplicably, despite learning of SolarCity management's alternate, lower projections, Evercore did not perform an additional DCF analysis and did not revise its valuation of SolarCity.  Nor did the Board request that Evercore perform such an analysis.  Instead, at an August 25, 2016 special meeting, despite its failure to perform any further DCF analysis, Evercore orally advised the Board that the SolarCity Liquidity Management Case did not alter "its prior valuation analysis." The Tesla Board similarly determined that the new information did not

"change[] its view as to the value of SolarCity," despite having neither requested nor received any further financial analysis.

62.     Indeed, the final Proxy dated October 12, 2016 admitted:  "Neither the Tesla Board nor the SolarCity Special Committee has obtained an updated fairness opinion as of the date of this joint proxy statement/prospectus from Evercore, Tesla's financial advisor, or Lazard, the SolarCity Special Committee's financial advisor."  Given the increasing losses at SolarCity, the Board should have obtained an updated fairness opinion to fully inform Tesla shareholders as to the value of the transaction. The Board's decision to rely on an outdated fairness opinion was not a valid exercise of business judgment.

**Evercore's Highly Misleading Selection of Terminal Values for Tesla and SolarCity in its DCF Analysis**

63.     When performing a DCF analysis, the terminal value is the single largest and most important input into the analysis.  The Proxy's discussion of Evercore's fairness opinion was also false and misleading because, in calculating the terminal value for its DCF analysis, Evercore selected a range for the perpetuity growth rate (the "PGR") that was unrealistic and misleading, and the Proxy failed to disclose why this range was chosen and what factors caused Evercore to select this unrealistic PGR.

64.     Egregiously, Evercore selected a 6-8% perpetual growth rate for Tesla.  This is completely unrealistic because it assumes that Tesla will continue to grow its earnings in perpetuity at a rate (6-8%) that is significantly higher than the growth rate of the overall economy.[7] The relevant part of the Proxy stated:

---

[7] Evercore's selected PGR assumed that SolarCity will (i) significantly increase its cash flows between 2020 and 2023, but Evercore provided no qualitative explanation for the sudden improvement, and (ii) then continue to grow at a rate that exceeds recent growth of the overall U.S. economy.

Evercore calculated the per share value range for Tesla's common stock by utilizing a range of discount rates from 10.0% - 12.0%, with a mid-point equal to Tesla's weighted average cost of capital, as estimated by Evercore (based on CAPM), *and a range of terminal values based on a range of estimated EBITDA exit multiples as well as a range of perpetuity growth rates of 6.00% - 8.00% (based on Evercore's professional judgment given the nature of Tesla and its business and the industries in which it operates).*

65.     Evercore also chose a PGR for SolarCity of 3-5%, which was also completely unrealistic and resulted in a fairness opinion that misled Tesla's shareholders about the wisdom of Tesla buying SolarCity. The relevant portion of the Proxy stated:

Evercore performed a discounted cash flow analysis of SolarCity to calculate a range of estimated present values as of December 31, 2016 of the standalone, levered, after-tax free cash flows that SolarCity was projected to generate from January 1, 2016 through December 31, 2020 under each of the SolarCity Unrestricted Liquidity Case and the SolarCity Revised Sensitivity Forecasts. *Evercore also calculated a range of terminal values for SolarCity by applying a range of perpetuity growth rates based on its professional judgment given the nature of SolarCity and its business and the industries in which it operates of 3.00% - 5.00%, to the projected standalone levered, after-tax free cash flows of SolarCity in the terminal year.* The resulting cash flows and the terminal values were then discounted to present value using a range of discount rates of 12.0% - 15.0%, (based on a range of estimates of SolarCity's cost of equity using the capital asset pricing model ("CAPM")), to derive a range of implied equity values for SolarCity. Under each of the SolarCity Unrestricted Liquidity Case and SolarCity Revised Sensitivity Forecasts, Evercore's analysis indicated an implied per-share equity value reference range for SolarCity on a standalone basis of approximately (i) $37.51 to $61.73 under the SolarCity Unrestricted Liquidity Case and (ii) $24.76 to $42.72 under the SolarCity Revised Sensitivity Forecasts.

66.     Despite Evercore's selection of completely unsupported and illogical PGRs for both Tesla and SolarCity, the Proxy never provides any justification for these PGRs.

67.     Lazard, in contrast, utilized a much lower PGR for SolarCity of just 1.5% to 3%, and also provided specific and factual reasons why such PGR was used (instead of just stating, as did Evercore, that the PGR was based on its "judgment").  The relevant portion of the Proxy stated:

Lazard performed a consolidated discounted cash flow analysis of SolarCity based on the SolarCity Unrestricted Liquidity Case. *Lazard calculated estimated terminal values for SolarCity by applying a perpetual growth rate range of 1.5% to 3.0%,*

*based upon, among other things, Lazard's estimates of long-term U.S. GDP growth, construction industry growth and potential cash flow increases related to certain tax attributes, offset by declines in the growth rate of new customer acquisitions over the long term. Lazard's calculation of estimated terminal values was normalized by taking into account SolarCity's potential steady-state growth rate and cost profile after 2020, informed by likely increased competition, product saturation in attractive markets (and corresponding entry into relatively less attractive markets) and modest GDP/housing growth over the long term.*

68.     It made no sense that SolarCity's own financial advisor, representing SolarCity which would theoretically have a vested interest (and fiduciary duty) in maximizing the value of SolarCity in a sale, used a PGR for SolarCity that was materially lower than that used by the buyer's investment banker, which would theoretically have a vested interest (and fiduciary duty) to pay as little as possible for SolarCity. There was no disclosure in the Proxy as to why Evercore made such an assumption.

69.     Finally, notwithstanding SolarCity's precarious financial condition, Evercore did not evaluate the solvency or fair value of SolarCity. All Evercore's analyses are merely theoretical if SolarCity cannot exist as a going-concern.

70.     The fairness opinions in the Proxy were also misleading because the valuation methodologies factored in a reasonable "control premium" for SolarCity based on an analysis of premiums paid by acquirers in past transactions.  This was not appropriate because Musk already controlled SolarCity.  If Musk truly believed that it was appropriate for Tesla to pay a control premium for SolarCity's shares, then that belief would be premised on an assertion that SolarCity was being mismanaged.  If that were the case, Musk could have replaced management rather than paying a control premium, since he already controlled SolarCity.  Thus, the information in the Proxy, which justified the price that Tesla paid for SolarCity in part based on a "control premium" rationale, was false and misleading.

71.     The relevant portion of the Proxy discussing precedent transaction premiums was as follows:

> Evercore analyzed the premium paid relative to the undisturbed target stock price. Based on the median of the undisturbed premiums of the selected transactions (calculated to be 34%), Evercore used a premium range of 25% 45% on SolarCity's trading price at close of market on June 21, 2016 to calculate an implied per share equity value range of $26 to $31. Evercore calculated an implied exchange ratio reference range by dividing the low end of the equity value per share reference range for SolarCity based on the precedent premiums paid analysis by the 5day Tesla VWAP as of July 29, 2016 and by dividing the high end of the equity value per share reference range for SolarCity based on the precedent premiums paid analysis by the 5day Tesla VWAP as of July 29, 2016. This indicated an implied exchange ratio reference range of 0.115 to 0.133 shares of Tesla Common Stock for each share of SolarCity Common Stock, as compared to the Exchange Ratio (which is 0.110) pursuant to the Acquisition Agreement.

72.     This analysis was false and misleading because average premiums paid in other transactions are irrelevant to a fairness opinion, as they are not informative of whether the present transaction is fair, especially in a stock-for-stock Acquisition such as the Tesla/SolarCity Acquisition. The Proxy was therefore materially misleading for stating that the Acquisition consideration was justified based on the premiums paid in past transactions, and for failure to disclose that average premiums paid in other transactions are irrelevant to a fairness opinion.

**The Proxy Was False and Misleading for Failing to Disclose That the Investment Bankers Did Not Perform a Relative Contribution Analysis**

73.     The Proxy failed to disclose that neither investment banker performed a relative contribution analysis, which is customary and appropriate in a stock-for-stock Acquisition. Indeed, a relative contribution analysis is used by investment bankers is approximately 90% of all stock-for-stock Acquisitions. The Proxy failed to disclose why a relative contribution analysis was not performed.

**The Proxy Was False and Misleading for Failing to Disclose That Evercore, Which Was Supposedly an "Independent" Investment Banker, Would Have Received No Fee If It Had Rendered a Negative Opinion**

74.     The Proxy states that Tesla picked Evercore based on its view that Evercore was "independent" and because of "the absence of material conflicts on the part of Evercore." *See* Proxy at p. 58.  For similar reasons, Tesla presumably did not use Goldman Sachs since Goldman was Tesla's regular investment banker and thus lacked independence based on the substantial investment banking fees Goldman had received in the past and could be expected to receive in the future from Tesla.

75.     However, the Proxy failed to disclose that Tesla negotiated a fee structure with Evercore that required Evercore to provide a favorable opinion on the fairness of the Acquisition to Tesla's shareholders in order to receive *any* compensation.  Under Evercore's fee structure, it would receive a total fee of $7 million if certain circumstances were met.  The majority of the fee -- $5.75 million – was contingent on the deal being consummated and thus was completely contingent on the deal going through.   The remaining portion of the fee, however -- $1.25 million – was also contingent on Evercore "delivering" its fairness opinion.  Thus, if Evercore would determine that the Acquisition was unfair, it would not be able to deliver a fairness opinion and would not receive the $1.25 million fee and thus would have received *no* compensation.

76.     This should have been disclosed in the Proxy since it compromised Evercore's independence.  By failing to disclose these facts, the Proxy was materially misleading because Tesla's shareholders were misled into believing that Evercore was completely independent and that its allegedly independent judgment was not affected by a desire to earn fees which were, in reality,

100% contingent on Evercore giving Tesla what it wanted – an opinion that said the Acquisition was fair from a financial point of view to Tesla and its shareholders.

**The Proxy Was False and Misleading for Failing to Disclose the True Extent of the Cash Drain at SolarCity and the Fact That It was a Certainty That Tesla Would Have to Raise Cash After the Acquisition**

77.     The Proxy was false and misleading because it stated that "While Tesla expects that its current sources of liquidity, including cash and cash equivalents, together with its current projections of cash flow from operating and retail financing activities, will provide it with adequate liquidity based on its current plans through at least the end of the current fiscal year, Tesla may raise funds in the future, including through potential equity or debt offerings.  This was false because, at the time the Proxy was disseminated, Tesla knew that it was a certainty that the Company would have to issue additional debt to fund the ongoing operations of the Company.  Indeed, at the time the Proxy was issued, Tesla was burning through 50 cents of cash for each dollar of revenue, while SolarCity was burning through a staggering $6.00.  SolarCity's cash stockpile had plunged to $146 million at the end of June 2016, down from $489 million the year before.

78.     The Defendants knew the Proxy was false in this regard because they knew that one of Tesla's principal sources of cash is an asset-based loan agreement (the "ABL") under which a group of banks, including Goldman Sachs Bank USA and Deutsche Bank AG, provide Tesla with up to $1 billion in revolving credit. The same day Tesla entered the Acquisition Agreement with SolarCity, Tesla also entered into a Fourth Amendment to the ABL with its lenders. That Fourth Amendment excluded SolarCity from the definition of Tesla "Subsidiaries" entitled to use funds borrowed under the ABL and, further, included a provision requiring that "Tesla and its Subsidiaries shall not guarantee or otherwise become directly liable for any Indebtedness of SolarCity…"

79.     Because the Defendants knew that they could not use cash from the ABL to fund SolarCity's massive cash needs after the transaction closed or guarantee SolarCity's debt, they knew that Tesla would have to raise more cash after the deal closed.

80.     The Proxy was also false and misleading for omitting to disclose the true extent of the increase in operating expenses that Tesla expected as a result of acquiring SolarCity.  Shortly after the acquisition of SolarCity closed, Tesla was forced to admit that its operating expenses had increased and were expected to continue to increase more than expected due to the purchase of SolarCity.

81.     In its Annual Report filed March 1, 2017, Tesla stated: "we expect operating expenses to increase as a result of the increased selling, general and administrative expenses incurred by our energy generation and storage segment. We expect selling, general and administrative expenses to continue to increase in absolute dollars but decline over time as a percentage of revenue as we focus on increasing operational efficiency while continuing to expand our customer and corporate infrastructure." Tesla's "energy generation and storage segment" is the name Tesla gave to SolarCity's operations after the Acquisition closed.

82.     The significant increase in operating expenses related to SolarCity's operations was surprising to analysts, because in the Annual Report Tesla indicated it expected to decrease the amount of customer acquisition costs from the levels historically incurred by SolarCity prior to the Acquisition: "We plan to reduce customer acquisition costs by cutting advertising spend and increasingly selling solar products in Tesla stores."  In other words, in spite of these cost-cutting benefits, the operating costs at the SolarCity "energy generation and storage segment" are expected to increase significantly in 2017.  This material fact, which was known to the defendants but not disclosed in the Proxy, made the Proxy false.

83.     Then, on March 16, 2017, Tesla announced that its deteriorating cash situation had forced it to raise significant additional cash from two major offerings:  (1) a stock offering of 1,335,878 shares of common stock, expected to raise between $347.4 million and $399.6 million; and (2) a bond offering of $850.0 million aggregate principal amount of 2.375% Convertible Senior Notes due March 15, 2022, expected to raise $839.8 million, or approximately $965.9 million if the underwriters exercise in full their overallotment option.  On this news, Tesla's stock declined precipitously, falling from $262 on March 16, 2017 to $250.68 on March 21, 2017.

84.     The Proxy was also false and misleading because it did not disclose that Tesla's cash position could be further affected after the Acquisition due to SolarCity's financing arrangements unless Tesla's stock price significantly increased.  This was due to the fact that SolarCity had repayment obligations under its debt agreements that were contingent on the price of Tesla stock.  As SolarCity admitted in its Annual Report that it filed with the SEC after the Acquisition closed, on March 1, 2017:  "Although our acquisition by Tesla in an all-stock transaction did not result in a "fundamental change," we continue to be responsible for payments of interest during the term and may need to repay principal at maturity unless the stock price of Tesla significantly appreciates and the convertible senior notes are converted into Tesla common stock. We may need to refinance the convertible senior notes. Our failure to pay amounts when due or repurchase the convertible senior notes when required would constitute a default which could also result in defaults under other agreements governing our existing or future indebtedness. If the repayment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and repurchase the convertible senior notes."  Upon the disclosure of this information, the price of Tesla stock declined by $7 over the next week, declining from $250 per share to $243 per share.

**The Proxy Was False and Misleading for Failing to Disclose the Increasing Pace of Restructuring Charges at SolarCity**

85.     The Proxy was false and misleading for failing to disclose expected restructuring charges of $42.6 million in Q4 2016 for SolarCity, and for failing to disclose the increasing pace and magnitude of restructuring charges.

86.     In 2015, SolarCity did not incur or recognize any restructuring charges.

87.     In Q1 2016, SolarCity also did not recognize any restructuring charges.  In Q2 2016, SolarCity recognized $29.1 million in charges.  The Proxy did not disclose any expected restructuring charges for Q3 2016 or Q4 2016, and thus investors were led to believe no further charges were anticipated.  However, one week before the shareholder vote on the Acquisition, SolarCity filed a Form 10-Q that disclosed $34.2 million in charges.  That disclosure was too late for most shareholders, since most shareholders mail in their proxy prior to the actual vote date, which was November 17, 2016, and do not attend the meeting in person.

88.     In addition, SolarCity's Q3 2016 Form 10-Q did not disclose any anticipated restructuring charges for the next quarter.

89.     When SolarCity finally filed its 2016 Annual Report on March 1, 2017, after the Acquisition had closed, it disclosed increasing and unexpected restructuring charges of $42.6 million in Q4 2016.  The Proxy should have been updated prior to the vote to reflect the actual significant restructuring charges already incurred for Q3 2016, as well as the expected Q4 2016 charges.  These charges significantly exceeded the charges that had been experienced by Tesla in the preceding year (which were zero) and in the previous two quarters.

///

///

**The Proxy Was False and Misleading Because It Stated That the Acquisition Was Conditioned on the Vote of a Majority of Disinterested Shareholders**

90.     The Proxy was false and misleading because it failed to identify all the significant shareholders who faced a conflict of interest due to their substantial stockholdings in SolarCity, and who thus had a motive to vote in favor of the Acquisition in order, like Musk, to salvage their investment in SolarCity, even if that meant allowing Tesla to significantly overpay for SolarCity.

91.     The Proxy stated that the Acquisition was conditioned upon stockholder approval at both Tesla and SolarCity, and that it required stockholder approval of not only a majority of the total shares of each company, but also a majority of shares not affiliated with Elon Musk, Gracias, and Jeffrey B. Straubel.  The Proxy failed to disclose, however, that those requirements were ineffective to protect Tesla because the universe of stockholders who were allowed to vote on the Acquisition still included many conflicted stockholders.

92.     Specifically, with respect to Tesla, the Proxy disclosed that Section 3.04 of the Acquisition Agreement provided that the Acquisition was subject to approval by (i) the holders of a majority of the total votes of Tesla shares cast at the special meeting of Tesla stockholders (the "Special Meeting"); and (ii) the holders of a majority of the total votes of Tesla shares not owned by "Excluded Parent Parties" cast at the Special Meeting. "Excluded Parent Parties" was defined in Section 9.03 of the Acquisition Agreement as: the directors and named executive officers of [SolarCity] in each case as of the date of this Agreement and/or as of record date set in respect of the [Special Meeting] and including, for the avoidance of doubt, Elon Musk, Antonio Gracias and Jeffrey B. Straubel, and the Persons in which any of the foregoing Persons have a pecuniary interest or in the name of which the shares of [Tesla] Common Stock of any of the foregoing Persons are registered or beneficially held, whether directly or indirectly.

93. The Proxy failed to disclose that the Acquisition Agreement did not exclude from the purportedly disinterested vote the following Tesla stockholders who are beholden to Elon Musk and/or who own, or whose family members and/or business partners own, SolarCity stock and therefore would benefit from the Acquisition:

(a) Tesla executive officers, including Jason Wheeler, Doug Field and Greg Reichow;

(b) Kimbal Musk;

(c) Jurvetson;

(d) Ehrenpreis;

(e) Buss;

(f) Tesla's second largest stockholder (after Elon Musk), Fidelity (FMR, LLC), which owns 10.2% of Tesla, 12.2% of SolarCity and is also a major investor in SpaceX; and

(g) Other stockholders of Tesla who also hold stock in SolarCity, including, without limitation, Bank of Montreal, The Vanguard Group, Morgan Stanley and BlackRock Institutional Trust Company, N.A.

94. The Proxy thus gave the false and misleading impression that the Acquisition could only take place if a majority of disinterested stockholders approved it. In reality, it did not require a majority vote by truly disinterested shareholder because the Acquisition Agreement did not exclude the votes of interested stockholders who collectively owned a substantial amount of SolarCity stock.

95. The defendants knew that these persons and institutional investors were significant shareholders of SolarCity due to the interlocking boards, the fact that defendants had been involved in such persons and entities investing in SolarCity, because they had access to SolarCity's shareholder lists and other information providing them with knowledge, and because their roles and

activities at Tesla and SolarCity provided them access to the information.

**The Proxy Failed to Disclose Important Facts About SolarCity's Special Committee, and Why Tesla Did Not Form a Special Committee**

96.     The Proxy failed to disclose that the special committee appointed to review the offer on behalf of SolarCity had strong ties to Elon Musk and Tesla.  The Proxy failed to disclose that the law firm hired by the special committee – Skadden Arps – lacked independence because Skadden has close ties to Musk.  For example, Skadden represented the underwriters who helped finance SolarCity's IPO, as well as banks such as Bank of America that financed SolarCity's SolarStrong project.  Skadden is also currently serving as counsel of record to Tesla in pending matters.  For example, Skadden is currently counsel of record for Tesla in *Tesla Motors, Inc. v. Hoerbiger Automotive Comfort Systems, LLC*, No. 5:16-cv-00288-EJD (N.D. Cal.), which action was filed on January 19, 2016 and is pending before Judge Davila.  The significant legal fees Skadden has earned representing Musk or those who have helped finance Musk's companies dwarf any fees Skadden earned in its representation of the SolarCity special committee, and thus raised a potential conflict of interest that should have been disclosed in the Proxy.

97.     Moreover, notwithstanding the numerous conflicts of interest faced by Tesla's directors, the Proxy omits any discussion of why the Tesla Board failed to create an independent committee to review the Acquisition.  The Proxy also fails to disclose why Elon Musk and Mr. Gracias were included in discussions about the Acquisition with the Tesla Board after such time as it was decided that they would be excluded from the vote on the Acquisition, other than stating that their participation would be "helpful."  Participation by conflicted directors is not "helpful" in protecting the interests of the Company and its public shareholders, and the Proxy does not disclose anything about why a special committee was not necessary to eliminate the ill-effects of the substantial conflicts faced by Musk and Gracias.

## DEFENDANTS' FIDUCIARY DUTIES

98.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in a personal financial benefit to themselves, the directors may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     discourages or inhibits alternative value-maximizing transactions;

(c)     contractually prohibits them from complying with their fiduciary duties; or

(d)     provides the directors with preferential treatment at the expense of, or separate from, the Company and its public shareholders.

99.     In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Tesla, were obligated to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties were divided;

(b)     participating in any transaction where the directors or officers received a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the Company or its public shareholders.

100.    Plaintiffs allege herein that defendants, separately and together, in connection with the Acquisition, breached and/or aided and abetted the breaches of fiduciary duties owed to plaintiffs and the other public shareholders of Tesla, including the duties of loyalty, good faith, candor, due care and independence.  As a result of these breaches of fiduciary duties and the aiding and abetting therein, Tesla was harmed.

101.   Because defendants breached their duties of due care, loyalty and good faith in connection with the Acquisition, and/or aided and abetted such breaches, the burden of proving the inherent or entire fairness of the Acquisition, including all aspects of its negotiation, structure, price and terms, is placed upon defendants as a matter of law.

## DAMAGES TO TESLA

102.   Tesla has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

103.   As a direct and proximate result of the Individual Defendants' misconduct, Tesla has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

    (a)   Entering into an improvident acquisition of SolarCity;

      a.   Overpaying significantly for SolarCity;

      b.   Damage to Tesla's credit rating and leverage;

      c.   Making it more expensive for Tesla to raise money; and

      d.   loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

## DERIVATIVE ALLEGATIONS

104.   Plaintiffs bring this action for the benefit of Tesla to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

105.   Tesla is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.    Plaintiffs are and have been Tesla shareholders during the entire Relevant Period because Mr. Freeman has continuously owned Tesla common stock since September 2015, and Ms. McMahon has continuously owned Tesla common stock since May 2013.  Plaintiffs therefore will adequately and fairly represent the interests of Tesla in enforcing and prosecuting its rights.

107.    Tesla's Board at the time this action was initiated consisted of the following directors: Elon Musk, Kimbal Musk, Gracias, Buss, Denholm, Ehrenpreis, and Jurvetson.  Plaintiffs have not made any demand on the Board to institute this action against the Individual Defendants because, for the reasons set forth below, such demand would be a futile and useless act.

## DEMAND FUTILITY ALLEGATIONS

### Demand is Futile as to Director Elon Musk

108.    Demand is futile as to Director Elon Musk because Musk is **_interested_**.  Musk derived a substantial financial and personal benefit from the Transaction.  The Acquisition was designed to avoid, and avoided, a complete loss of Musk's investment in SolarCity.  Prior to the Acquisition, it was widely reported that SolarCity was at significant risk of bankruptcy.  Even if SolarCity had not gone bankrupt, its rapidly deteriorating financial condition and falling stock price prior to the Acquisition would have resulted in a margin call on Elon Musk's $475 million in personal loans. By causing Tesla to buy SolarCity, Musk realized these significant personal financial benefits and/or avoided substantial losses – benefits which were not shared by Tesla's public shareholders.

109.    As discussed herein, Elon Musk also stands to benefit because the Acquisition will protect the investments of Valor, DFJ and DBL Partners in SolarCity. Valor, DFJ and DBL Partners are frequent investors in Elon Musk's various entities, and therefore keeping these investors happy will allow him to continue seeking financing from them in the future.

110.    In addition, as discussed herein, by causing the Company to bail out SolarCity, the Acquisition benefits Elon Musk's cousins, Lyndon and Peter Rive, who are SolarCity co-founders,

3.9% and 3.8% (respectively) stockholders, and will serve as executives of the surviving SolarCity subsidiary of Tesla following the consummation of the Acquisition.

111.   The Acquisition will also benefit Elon Musk's brother Kimbal Musk and close friend Gracias, both of whom are SolarCity stockholders.

112.   Moreover, Musk faced an irreconcilable conflict on the SolarCity acquisition because Musk is the founder of both Tesla and SolarCity, on the board of both companies, and faced a conflict in attempting to fulfill his conflicting fiduciary duties at both companies.  Because he was Chairman of the Board of SolarCity and its largest stockholder, Elon Musk had a financial interest in salvaging his own SolarCity investment.  As a director of Tesla, however, Musk had a duty to ensure that Tesla did not overpay for SolarCity.

113.   Musk admitted that these conflicting duties could not be reconciled, and thus recused himself from voting on the Acquisition.

114.   In addition, Tesla admits in its SEC filings that Musk is not independent.

115.   For these reasons, demand is futile as to Director Elon Musk.

**Demand is Futile as to Director Kimbal Musk**

116.   Demand is futile as to Director Kimbal Musk because Kimbal Musk is <u>financially interested</u> in the Acquisition, which benefits himself and his family members (Elon Musk, Peter Rive and Lyndon Rive), who collectively owned over 26% of SolarCity's common stock prior to the Acquisition.  Because Musk received a substantial financial interest in the Acquisition by having his declining SolarCity stock purchased by Tesla, Kimbal Musk is interested and cannot exercise independent judgment as to the claims asserted herein.

117.   Demand is also futile as to Director Kimbal Musk because he is not independent from his brother Elon. Kimbal Musk sits on the Boards of Directors of Tesla and SpaceX, and

collects significant director fees as a result thereof. In 2015, Kimbal Musk received director compensation from Tesla alone in the amount of $4,964,381.

118.    Defendant Kimbal Musk has served on the Tesla Board since April 2004. He is the brother of Elon Musk and cousin of Lyndon and Peter Rive. Tesla admits in its SEC filings that Kimbal Musk is not an independent director of the Company.

119.    Kimbal Musk beneficially owns 147,541 shares of SolarCity common stock. In fiscal year 2015, Kimbal Musk earned $4,964,381 as a director of Tesla. The vast majority of his holdings in Tesla and SolarCity are pledged as collateral to secure personal indebtedness.

120.    Kimbal Musk is also a director of SpaceX and a limited partner of Valor Equity Partners II, L.P. (in which his brother has also invested) and Valor Equity Partners III-A, L.P., both of which are funds advised by Valor.

121.    In addition, Kimbal Musk is not independent from Gracias (his brother's close friend with whom he sits on both the Tesla Board and the SpaceX Board), who is interested in the Acquisition and, through his control over Valor, manages two private equity funds in which Kimbal Musk has invested.

122.    For all these reasons, Kimbal Musk cannot disinterestedly and independently consider a demand to prosecute the claims alleged herein.

**Demand Is Futile as to Director Buss**

123.    Like Elon Musk and Gracias, Buss stands on both sides of the Acquisition in two respects. First, he beneficially owns 89,203 shares of SolarCity common stock. Second, though Buss resigned as the Chief Financial Officer of SolarCity in 2016, he continued to serve as a consultant to SolarCity through the consummation of the Acquisition.

124.    Buss's current primary source of income is his lucrative position as a director of Tesla. In fiscal year 2015, Buss earned $4,954,785 in director fees from Tesla. Accordingly, Buss

cannot disinterestedly and independently consider a demand against (i) Denholm, Ehrenpreis and Gracias, who as members of Tesla's Compensation Committee, make recommendations to the Board as to director compensation; (ii) Elon Musk, who provides Buss with his main income of nearly $5 million in director fees and who helped salvage Buss' substantial investment in SolarCity; and (iii) his fellow Board members as a whole, who consider the Compensation Committee's recommendations and ultimately approve director compensation.

**Demand Is Futile as to Director Gracias**

125.    Demand is futile as to Director Gracias, who is a member of both the Tesla Board and the SolarCity Board. As such, Gracias is admittedly conflicted since he stands on both sides of the Acquisition.

126.    Given Gracias' substantial and inherent conflict of interest, he was forced to abstain from voting on the Acquisition. Because he was not allowed to vote on the Acquisition due to his conflict, Gracias can hardly be relied upon to be independent and objective regarding the claims in this lawsuit.

127.    In addition, Gracias is <u>financially interested</u> (personally and through certain Valor funds) because he beneficially owns SolarCity common stock and therefore stands to benefit from the Acquisition.

128.    Furthermore, Gracias cannot disinterestedly and independently consider a demand against his close friend Elon Musk. The relationship between Elon Musk and Gracias dates back to at least 2001, when Gracias invested in PayPal. Elon Musk subsequently provided Gracias and Valor the opportunity to participate in several pre-IPO venture funding rounds for SolarCity, Tesla and SpaceX, and appointed him to the board of directors of each company. In fiscal year 2015, Gracias received almost $11 million in aggregate director compensation from Tesla and SolarCity, in addition to whatever he earned as a director of SpaceX.

129.    In addition, both Elon Musk and Kimbal Musk are invested in various Valor funds. As manager of these funds, Gracias serves as a fiduciary to Elon Musk and Kimbal Musk.

130.    Valor's website includes a testimonial from Elon Musk, in which he describes Gracias's value to Tesla:

> I'd like to thank Valor for being a key investor. And not just an investor, but a strategic partner. I don't think we would've made it without their help, so thank you.[8]

131.    Similarly, Valor's website includes the following testimonial from Peter Rive, COO & CTO of SolarCity:

> Valor is simply the best investor I've ever worked with. Their initial diligence is thoughtful and detailed, but their help in improving the company after the investment is invaluable. They have an awesome team who implement lean process methodologies to improve throughput without an increase in operating expenses. I want to emphasize the word "implement" which is key to the Valor guys. They're not consultants who create a set of power point presentations - they actually do the work! The end result is that when Valor invested in our company they simultaneously lowered the execution risk of the business.

132.    Gracias uses these testimonials to solicit fund investors and entrepreneurs seeking venture capital on behalf of Valor.

133.    Defendant Gracias has served on the Tesla Board since May 2007. Mr. Gracias invested in PayPal, an online payment service, and along the way was introduced to PayPal co-founder Elon Musk. The two struck up a friendship, and when Mr. Musk decided to back the company that would become Tesla Motors Inc., he invited Mr. Gracias to put in some of his own money as well.[9] At the time, the world's first high-speed electric car was just a prototype in a garage.

---

[8] http://www.valorep.com/about  (last visited Mar. 13, 2017).

[9] *See* Ann Saphir, "Chicago private equity manager quietly pulls in pension money with solid returns," PENSIONS & INVESTMENTS, Oct. 13, 2009 (available at http://www.pionline.com/article/20091013/ONLINE/910139998/chicago-private-equity-manager-quietly-pulls-in-pension-money-with-solid-returns, last visited Mar. 8, 2017).

134.    Later, Gracias's extremely close friendship with Musk was revealed when Musk allocated one of only four Tesla Roadsters that had been built to Gracias.  Also, when Tesla came out with a sedan in 2010, Gracias was given the right to reserve the second one off the assembly line, after Elon Musk who got the first car.

135.    Gracias is the founder, managing partner, CEO, Chief Investment Officer, director and sole owner of the private equity firm Valor.

136.    Gracias has long been an investor in Elon Musk's enterprises, dating back to his investment in PayPal.  Gracias and Valor participated in several pre-IPO venture funding rounds for SolarCity, Tesla and SpaceX, and Gracias serves on the boards of directors of all three companies.[10] Today, a model rocket standing at the center of Valor's Chicago Hancock Center office points to the firm's biggest investment: SpaceX. Gracias beneficially owns 211,854 shares of SolarCity common stock, which includes (a) 159,023 shares held by AJG Growth Fund, LLC, an investment fund Gracias manages, (b) 38,665 shares held by a Valor private equity fund, Valor Equity Management II, LP, and (c) 14,166 shares issuable upon exercise of options exercisable within 60 days of September 15, 2016.

137.    Indeed, Gracias' ties to Musk are so close that a full half of all Valor's 16 investments have been in Musk companies:

///

///

---

[10] As Gracias' firm Valor raised money for the first time from institutional investors in 2007, collecting $300 million from pensions, endowments and foundations for a second fund, he started to take ownership stakes in Musk enterprises, personally and through Valor. The firm invested in three California companies: Palo Alto-based electric car maker Tesla, in 2005 and 2008; San Mateo solar panel marketer SolarCity, in 2012 and Hawthorne-based SpaceX, in 2008 and again between 2010 and 2015.

| Date | | Amount Invested | Round | Company Investing $$ |
|------|--|-----------------|-------|----------------------|
| Jan, 2016 | Tovala | $500k / Seed | | Valor Equity Partners |
| Oct, 2015 | Renovate America | $90M / Private Equity | | Valor Equity Partners |
| Sep, 2015 | Premise | $50M / Series C (Lead) | | Valor Equity Partners |
| Jan, 2015 | SpaceX | $1B / Series E | | Valor Equity Partners |
| Jan, 2015 | Porch | $65M / Series B (Lead) | | Valor Equity Partners |
| Jul, 2014 | Renovate America | $50M / Private Equity (Lead) | | Valor Equity Partners |
| May, 2014 | Addepar | $50M / Series C (Lead) | | Valor Equity Partners |
| Nov, 2013 | Fooda | $5M / Series A (Lead) | | Valor Equity Partners |
| Feb, 2012 | SolarCity | $81M / Series G (Lead) | | Valor Equity Partners |
| Nov, 2010 | SpaceX | $50M / Series C | | Valor Equity Partners |
| Nov, 2008 | Tesla | $40M / Debt Financing | | Valor Equity Partners |
| May, 2008 | Tesla | $40.17M / Debt Financing | | Valor Equity Partners |
| Feb, 2008 | Tesla | $40M / Series E | | Valor Equity Partners |
| May, 2007 | Tesla | $45M / Series D | | Valor Equity Partners |
| May, 2006 | Tesla | $40M / Series C | | Valor Equity Partners |
| Feb, 2005 | Tesla | $13M / Series B (Lead) | | Valor Equity Partners |

138.     Elon Musk has invested in Gracias's funds as well.  For these reasons, it is not surprising that Gracias has been described as one of Elon Musk's closest friends.

139.     Moreover, as a member of the Audit Committee, Gracias was aware that the Audit Committee charter required the Audit Committee to review and approve "in advance any proposed related" party transactions. The Audit Committee was therefore required to review and approve the Acquisition in advance, but failed to do so.  As a result, Gracias acted in bad faith and breached his fiduciary duty of loyalty by allowing the Acquisition, which provided substantial personal financial benefits to many Board members, to occur without first having the Audit Committee review and approve the Acquisition. A breach of the duty of loyalty cannot be indemnified, and thus Gracias faces a substantial likelihood of liability for his conduct.

140.     Demand is thus futile as to Gracias.

**Demand is Futile as to Ehrenpreis**

141.    Demand is futile as to Defendant Ehrenpreis because Ehrenpreis is ***interested*** and because Ehrenpreis cannot exercise independent business judgment.  Since 2014, Ehrenpreis has been a managing partner and co-owner of venture capital firm DBL Partners, which he co-founded with fellow managing partner and co-owner Nancy Pfund ("Pfund"). Pfund was a member of the SolarCity Board and one of the two members of the Special Committee of the SolarCity Board (the "SolarCity Special Committee") that negotiated and approved the Acquisition on behalf of SolarCity. Pfund beneficially owns 1.5% of SolarCity's shares of common stock and thus had a vested financial interest in the Acquisition.

142.    Pfund is also the managing director and founder of DBL Investors, LLC ("DBL Investors"). DBL Investors funds participated in SolarCity's Series D venture funding round (closed November 1, 2008); a Series E-1 preferred stock financing round (June 2010), contributing $1 million in capital; and a Series F preferred stock financing round (June and July 2011), contributing more than $1.6 million. Pfund beneficially owns (personally and through DBL Investors investment funds) 1,554,114 shares of SolarCity common stock.[11]   DBL Investors has also invested in SpaceX.

143.    Pfund is a close friend of Elon Musk's and has said that "[h]e's always been a master of the universe in my mind." *See* Barry Randall, "Even Musk Can't Make SolarCity, Tesla

_____

[11] This includes: (a) 449,279 shares held of record by Bay Area Equity Fund I, L.P. (of which DBL Investors is the managing member of the general partner), which represents approximately 15-20% of this fund's total assets under management -- valued at $52,648,556 according to DBL Investors' most recent Form ADV filed with the SEC on March 29, 2016; (b) 928,977 shares held of record by DBL Equity Fund-BAEF II, L.P.; (c) 119,208 shares held of record by Pfund as co-trustee of The Pfund Polakoff Family Trust dated February 18, 1993; (d) 38,000 shares held of record by The Pfund Polakoff 2014 CRUT u/a/d 11/07/14; and (e) 18,650 shares issuable upon exercise of options exercisable within 60 days from September 15, 2016.

Deal Make Sense," Marketwatch, Sept. 21, 2016.[12] Pfund also previously served on the Tesla Board for four years before its IPO, from 2006 to 2010.

144. Defendant Ehrenpreis is also interested because he, Pfund, and several funds they manage are significant investors in all three of Musk's companies – Tesla, SolarCity, and SpaceX. Ehrenpreis is also an investor in and serves on the board of directors of Mapbox, Inc. ("Mapbox"), a provider of custom online maps. In December of 2015, Tesla and Mapbox entered into an agreement pursuant to which Tesla expects to pay Mapbox certain ongoing fees, including $5 million over the first 12 months of the agreement. In addition, Ehrenpreis is a manager of DBL Partners Fund III ("DBL III"). Both Ehrenpreis and DBL III are investors in SpaceX.

145. For these reasons, Ehrenpreis is interested and cannot exercise independent and objective business judgment regarding the claims asserted herein.

**Demand is Futile as to Jurvetson**

146. Demand is futile as to Defendant Jurvetson because Jurvetson is ***interested*** and cannot exercise independent business judgment. Jurvetson, his partner Fisher, and several funds managed by their venture capital firm DFJ own significant amounts of SolarCity stock. As such, Jurvetson has personal financial interests in the SolarCity acquisition, from which he derived personal financial benefits that make him interested in the transaction and thus not capable of disinterestedly considering a demand to bring the claims asserted herein.

147. Jurvetson has served on the Tesla Board since June 2009. He is a member of the Tesla Board's Audit Committee. In fiscal year 2015, Jurvetson earned $6,095,984 as a Tesla director. Jurvetson is also a close personal friend of Elon Musk, who gave Jurvetson the first Tesla Model S ever made, and the second Tesla Model X.

---

[12] Available at http://www.marketwatch.com/story/even-musk-cant-make-solarcity-tesla-deal-make-sense-2016-09-21, last visited Mar. 22, 2017.

148.    Jurvetson and DFJ also serve as fiduciaries of the Elon Musk Trust, which is a limited partner of DFJ invesment fund Draper Fisher Jurvetson Fund X, L.P.

149.    Jurvetson is a managing director of venture capital firm DFJ. Another managing director of DFJ, Fisher, is a director of SolarCity. DFJ invested in Tesla before its 2010 IPO, participating in Tesla's Series C (closed May 1, 2006), Series D (closed May 11, 2007), and Series E (closed February 8, 2008) venture funding rounds. Jurvetson joined the Tesla Board after the IPO. DFJ has not held Tesla stock since late 2014 or early 2015.

150.    DFJ also invested in several of SolarCity's pre-IPO venture funding rounds. Funds managed by DFJ beneficially own 3,308,266 shares of SolarCity's common stock — approximately 3.3% of shares outstanding.[13] In addition, both Jurvetson and Fisher personally own SolarCity common stock. Specifically, Jurvetson owns 417,450 shares of SolarCity common stock held by the Steve and Karla Jurvetson Living Trust dated August 27, 2002. Fisher owns 452,867 shares of SolarCity stock.[14]

---

[13] DFJ's ownership of SolarCity includes: (a) 826,745 shares held of record by Draper Fisher Jurvetson Fund IX, L.P.; (b) 260,838 shares held of record by Draper Fisher Jurvetson Fund X, L.P.; (c) 1,653,952 shares held of record by Draper Fisher Jurvetson Growth Fund 2006, L.P.; (d) 22,403 shares held of record by Draper Fisher Jurvetson Partners IX, LLC; (e) 7,970 shares held of record by Draper Fisher Jurvetson Partners X, LLC; (f) 136,138 shares held of record by Draper Fisher Jurvetson Partners Growth Fund 2006, LLC; (g) 518 shares held of record by Draper Fisher Jurvetson Fund IX Partners, L.P.; (h) 319 shares held of record by Draper Fisher Jurvetson Fund X Partners, L.P., (i) 177,612 shares held of record by Draper Associates, L.P.; (j) 160,396 shares held of record by Draper Associates Riskmasters Fund, LLC, and (k) 61,375 shares held of record by Draper Associates Riskmasters Fund III, LLC.

[14] This includes: (a) 401,053 shares of SolarCity common stock held by the John Fisher and Jennifer Caldwell Living Trust dated January 7, 2000, as amended and restated March 27, 2008; (b) 6,776 shares held directly by The Fisher/Caldwell 2012 Irrevocable Children's Trust U/A/D 6-12-12; (c) 1,500 shares held by Caren Patrick, custodian for each of the Saskia C. Fisher UTMA CA and Annelise Fisher UTMA CA; (d) 500 shares are held by Fisher as Custodian of the Eliza Foster UTMA; (e) 18,650 shares issuable upon the exercise of options exercisable within 60 days of September 15, 2016, which, pursuant to the terms of the Acquisition Agreement, will be converted into Tesla stock options; and (f) 24,388 shares of SolarCity common stock held by investment firm JHNF Investment LLC, which Fisher manages.

151.    DFJ has made a significant profit in its SolarCity investment, selling down its original 26.2% stake to just 3.3% since the company's December 2012 IPO.

152.    According to Tesla's 2016 annual proxy statement, DFJ is also a "significant stockholder" of SpaceX and participated in numerous venture funding rounds for that company.[15] Jurvetson, Fisher and another DFJ managing director, Randall S. Glein, all serve on the SpaceX Board.

153.    Similar to Elon Musk's relationship with Gracias, not only does DFJ invest in Elon Musk, Elon Musk invests in DFJ. Specifically, the Elon Musk Trust is a limited partner in the Draper Fisher Jurvetson Fund X, L.P.

154.    Moreover, as a member of the Audit Committee, Jurevetson was aware that the Audit Committee charter required the Audit Committee to review and approve "in advance any proposed related" party transactions. The Audit Committee was therefore required to review and approve the Acquisition in advance, but failed to do so.  As a result, Jurvetson acted in bad faith and breached his fiduciary duty of loyalty by allowing the Acquisition, which provided substantial personal financial benefits to many Board members, to occur without first having the Audit Committee review and approve the Acquisition. A breach of the duty of loyalty cannot be indemnified, and thus Jurvetson faces a substantial likelihood of liability for his conduct.

155.    Demand is therefore futile as to Jurvetson.

**Demand Is Futile as to Denholm**

156.    Demand is futile as to Defendant Denholm because: (1) Denholm faces a substantial likelihood of liability by breaching her duties of loyalty and candor by approving the false and

---

[15] DFJ participated in the following early venture funding rounds of SpaceX: $30.44 million Series B (August 11, 2009); $50 million Series C (November 8, 2010); lead investor in $30 million Series D (December 21, 2012); $1 billion Series E (January 20, 2015).

misleading Proxy and allowing conflicted directors Musk and Gracias to exercise undue influence over the Acquisition; and (2) Denholm cannot exercise disinterested judgment as to the claims asserted herein.

157.   In addition, Denholm is beholden to Musk.  Denholm left Juniper in February 2016, and does not have a full-time job. Accordingly, her current sole source of income is her lucrative position as a director of Tesla.  In fiscal years 2014 and 2015, Denholm earned $7,181,066 and $4,979,785, respectively, in director fees as a Tesla director. These fees dwarf the fees other directors at publicly-traded companies receive for serving as outside directors.

158.   With respect to the Proxy and fairness opinions, Denholm was in a unique position to know that Evercore's fairness opinion was grossly inadequate and inaccurate.  Because of her financial expertise, Tesla considers Denholm a "financial expert" and thus appointed her to serve as Chair of Tesla's Audit Committee.  Tesla's 2016 annual proxy stated:  "We believe that Ms. Denholm possesses specific attributes that qualify her to serve as a member of our Board of Directors and to serve as chair of our Audit Committee, including her executive experience and her financial and accounting expertise with international companies, including in the technology and automotive industries."  Indeed, Denholm served at Toyota Motor Corporation Australia for seven years and at Arthur Andersen & Company for five years in various finance assignments. Ms. Denholm is a Fellow of the Institute of Chartered Accountants of Australia and holds a Bachelor's degree in Economics from the University of Sydney and a Master's degree in Commerce from the University of New South Wales.

159.   Based on her substantial financial expertise and experience, Denholm knew that Evercore should have used Tesla's internal financial projections to prepare its fairness opinion, and also knew that for the reasons stated herein, Tesla should have required Evercore to update its

fairness opinion prior to the shareholder vote on the Acquisition. She also knew the Proxy was false and misleading for the other reasons stated herein. Instead of complying with her fiduciary duties and causing Tesla to correct the errors in the Proxy, she allowed Musk and Gracias to influence her and the other Board members and disseminate the Proxy without correcting the material errors. In doing so, she acted in bad faith and breached her duty of loyalty and candor to Tesla. Denholm thus faces a substantial likelihood of liability.

160.    Moreover, as the Chair of the Audit Committee, Denholm was well aware that Tesla's Audit Committee charter requires the Audit Committee to review and approve "in advance any proposed related" party transactions. The Audit Committee was therefore required to review and approve the Acquisition in advance, but failed to do so. As a result, Denholm acted in bad faith and breached her fiduciary duty of loyalty by allowing the Acquisition, which provided substantial personal financial benefits to many Board members, to occur without first having the Audit Committee review and approve the Acquisition. A breach of the duty of loyalty cannot be indemnified, and thus Denholm faces a substantial likelihood of liability for her conduct.

161.    Accordingly, Denholm cannot disinterestedly and independently consider a demand.

**Demand is Futile as to All Director Defendants for Additional Reasons**

162.    Demand is futile as to Defendants Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss because: (1) they allowed their fellow admittedly interested directors – Elon Musk and Gracias – to participate in Board discussions regarding the Acquisition; (2) reviewed and approved a materially misleading Proxy Statement that was sent to Tesla shareholders soliciting their vote in favor of the Acquisition; and (3) failed to require Evercore to update its fairness opinion.

163.    Despite their clear conflicts of interest given their significant ownership of SolarCity shares and bonds, as well as their board positions at SolarCity, Musk and Gracias were allowed to

participate in discussions regarding the SolarCity acquisition.  As the Proxy notes at p. 59: "After discussion, *the Tesla Board determined that the strategic vision, expertise and perspectives of Messrs. Elon Musk and Antonio Gracias would continue to be helpful to the Tesla Board's evaluation of a potential acquisition of a solar energy company* because of their involvement in the solar industry, but that Messrs. Elon Musk and Antonio Gracias, as a result of their service on the SolarCity Board, should recuse themselves from any vote by the Tesla Board on matters relating to a potential acquisition of SolarCity, including evaluation, negotiation and approval of the economic terms of any such acquisition. The Tesla Board also determined that the members of the Tesla Board other than Messrs. Elon Musk and Antonio Gracias should have the opportunity to deliberate with respect to any potential SolarCity transaction outside the presence of Messrs. Elon Musk and Antonio Gracias."  Thus, even though Musk and Gracias were not allowed to vote due to their material and substantial conflicts of interest, Defendants Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss allowed Elon Musk and Gracias to participate in the discussions about the acquisition of SolarCity at Board meetings.

164.    Such conduct constitutes bad faith and a knowing failure to protect the interests of Tesla and its minority shareholders.  Because of their conflicts, Elon Musk and Gracias should have been precluded from participating in any discussions regarding the Acquisition.  The failure of Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss to preclude Elon Musk and Gracias from all deliberations and influence constituted a breach of such directors duty of loyalty to Tesla.  As such, demand is futile as to Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss.

165.    Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss also, as more fully alleged herein, failed to require Evercore to update its fairness opinion.  The final Proxy dated October 12, 2016 admitted:  "Neither the Tesla Board nor the SolarCity Special Committee has obtained an

updated fairness opinion as of the date of this joint proxy statement/prospectus from Evercore, Tesla's financial advisor, or Lazard, the SolarCity Special Committee's financial advisor." Given the directors' knowledge that SolarCity's financial condition had deteriorated since the fairness opinion had been prepared, and given the fact that the Directors knew that the fairness opinion did not utilize financial projections that had been prepared by Tesla's management, the Directors acted in bad faith and breached their duty of loyalty by not requiring Evercore to update its fairness opinion.

166.    As alleged herein, Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss also reviewed and approved the false Proxy.  As such, they breached their duty of candor and loyalty to Tesla, thereby excusing demand.

167.    All such directors also received immense annual director fees from Tesla that impaired their judgment.  These fees, which are summarized as follows from Tesla's 2016 Proxy, significantly exceed the director fees most directors at publicly-traded companies receive:

| | Fees Earned or Paid in Cash ($) | Option Awards ($)(1)(2)(3) | All Other Compensation(4) | Total ($) |
|---|---|---|---|---|
| Brad W. Buss | 20,000 | 4,934,785 | — | 4,954,785 |
| Robyn M. Denholm | 45,000 | 4,934,785 | — | 4,979,785 |
| Ira Ehrenpreis. | 37,500 | 7,202,183 | — | 7,239,683 |
| Antonio J. Gracias | 37,500 | 9,753,005 | — | 9,790,505 |
| Stephen T. Jurvetson | 27,500 | 6,068,484 | — | 6,095,984 |
| Kimbal Musk | 20,000 | 4,934,785 | 9,596 | 4,964,381 |

168.    Demand is therefore futile as to Kimbal Musk, Ehrenpreis, Jurvetson, Denholm, and Buss.

**Demand is Also Futile Because the Directors are Not Entitled to the Protection of the Business Judgment Rule**

169.    Demand is futile as to all directors because the business judgment rule is inapplicable to their conduct in connection with the Acquisition.  Elon Musk had actual control and influence

over the Board's decisions to approve the Acquisition. The Acquisition was conceived of and instigated by Musk and approved by a majority of directors who each shared with Elon Musk a personal financial interest in the Acquisition.

170. Because Elon Musk is a controlling stockholder who stands on both sides of the Acquisition, the business judgment rule does not protect the Board's decision to approve the Acquisition, and demand is therefore excused.

171. In addition, the Acquisition was not approved by a Board majority consisting of independent and disinterested directors. Five of Tesla's seven directors - each of whom suffered disabling conflicts - voted to approve the Acquisition. For this reason as well, the business judgment rule does not protect the Board's decision to approve the Acquisition, and demand is therefore excused.

172. The business judgment rule is also inapplicable because the Tesla Board's approval of the Acquisition was not taken honestly and in good faith. As explained above, the Tesla Board's approval of the Acquisition advanced the interests of Elon Musk and other insiders rather than the interests of Tesla and its minority stockholders. Furthermore, despite the potent conflicts possessed by a majority of its members, Directors Buss, Ehrenpreis, Denholm, Kimbal Musk, and Jurvetson failed to form a special committee of disinterested and independent directors; permitted Elon Musk and Gracias to fully participate in Board meetings and deliberations; and failed to require recusals of the other conflicted directors. The Acquisition also violated the Board's own internal governance procedures. As the Company's public filings explain, Tesla's Audit Committee charter requires the Audit Committee to review and approve "in advance any proposed related" party transactions. The Audit Committee was therefore required to review and approve the Acquisition in advance, but failed to do so.

173.     The Board also failed to consider any alternatives to the Acquisition. The Board knowingly failed to inform itself concerning material aspects of the Acquisition. As explained above, after learning that SolarCity had withheld material information regarding management's forecasts for the Company, the Board failed to request that Evercore perform an additional DCF analysis using those forecasts or perform any additional analysis regarding the value of SolarCity.

174.     Finally, analysts have been virtually unanimous in their assessment that the Acquisition did not make any business sense for Tesla, and was merely a bailout of SolarCity to salvage Musk's substantial investments in SolarCity, providing additional evidence that the decision to enter into the Acquisition did not constitute the valid exercise of business judgment.

### FIRST CAUSE OF ACTION
### Against Defendants for Violations of § 14(a) of the 1934 Act and SEC Rule 14a-9 Promulgated Thereunder

175.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176.     The section 14(a) 1934 Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants. The section 14(a) 1934 Act claims alleged herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these proxy law claims.

177.     During the Relevant Period, defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

178.     The Proxy was prepared, reviewed and/or disseminated by defendants.   It misrepresented and/or omitted material facts, including material information about the unfair consideration offered in the Acquisition, and the actual intrinsic value of the Company.

179.     In so doing, defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, defendants were aware of this information and of their duty to disclose this information in the Proxy.

180.     Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

181.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote on the Acquisition. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

182.     By reason of the foregoing, defendants have violated § 14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

183.     Because of the false and misleading statements in the Proxy, plaintiffs, the Company and its public shareholders are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## SECOND CAUSE OF ACTION
### Against Defendants for Violation of § 20(a) of the 1934 Act

184.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185.     Defendants acted as controlling persons of Tesla within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors and/or controlling shareholders and/or advisors of Tesla, and/or their participation in and/or awareness of

the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.

186.    Each of the defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

187.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Acquisition. They were thus directly involved in the making of this document.

188.    Tesla also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

189.    In addition, as the Proxy sets forth at length, and as described herein, defendants were each involved in negotiating, reviewing and approving the Acquisition.

190.    By virtue of the foregoing, defendants have violated § 20(a) of the 1934 Act.

191.    As set forth above, defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) of the 1934 Act and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these

defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiffs, the Company and its public shareholders will be irreparably harmed.

**THIRD CAUSE OF ACTION**
**Breaches of Fiduciary Duties Against the Individual Defendants**

192.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

193.    The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith and independence owed to Tesla and its public shareholders and have acted to put their personal interests ahead of the interests of Tesla and its public shareholders.

194.    By the acts, transactions, and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, have harmed Tesla.

195.    The Individual Defendants have violated their fiduciary duties by entering into the Acquisition without regard to the effect of the Acquisition on Tesla and its public shareholders.

196.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the shareholders of Tesla because, among other reasons: (a) they breached their duty of loyalty and candor to Tesla; (b) they failed to properly value Tesla and its various assets and operations; and (c) they ignored or did not protect against the numerous conflicts of interest resulting from defendants' own interrelationships or connection with the Acquisition.

197.    Because the Individual Defendants dominate and control the business and corporate affairs of Tesla, have access to private corporate information concerning Tesla's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the minority shareholders of Tesla which makes it inherently unfair for them to pursue and recommend any proposed transaction wherein they will reap disproportionate benefits to the

exclusion of Tesla and its public shareholders.

198.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Tesla.

199.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Tesla, and have breached and are breaching their fiduciary duties to Tesla.

200.    As a result of the Individual Defendants' unlawful actions, Tesla has been damaged.

## FOURTH CAUSE OF ACTION
### For Unjust Enrichment Against Defendants Buss, Jurvetson, Kimball Musk, Elon Musk, and Gracias

201.    Plaintiffs incorporate by reference and reallege each and every allegation contained above as though fully set forth herein.

202.    As a result of the conduct alleged herein, Individual Defendants Buss, Jurvetson, Kimball Musk, Elon Musk, and Gracias were unjustly enriched.  Because the Acquisition was designed to be a bailout of SolarCity, and because Defendants Buss, Jurvetson, Kimball Musk, Elon Musk, and Gracias held substantial investments in SolarCity, such defendants were unjustly enriched because their SolarCity stock was rescued.   The Acquisition forces Tesla and all its stockholders to absorb a portion of SolarCity's losses regardless of whether they currently hold SolarCity stock themselves.

203.    It would be unjust to allow such defendants to retain their improper benefits.

204.    As a result, defendants should be ordered to disgorge all benefits they received as a result of their conduct.

///

///

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand relief, in plaintiffs' favor against defendants, as follows:

A.      Declaring that defendants violated §§ 14(a) and 20(a) of the 1934 Act by failing to provide shareholders with all material information about the Acquisition, the conflicts of interest suffered by defendants in connection with the Acquisition, the unfair consideration offered in the Acquisition, and the actual intrinsic value of the Company;

B.      Awarding damages;

C.      Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

D.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  March 24, 2017

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone:  302-984-3800
Facsimile:   302-984-3939
Email: bbennett@coochtaylor.com
*Attorneys for Plaintiffs*

**OF COUNSEL**
**BOTTINI & BOTTINI, INC.**
FRANCIS A. BOTTINI, JR.
ALBERT Y. CHANG
7817 Ivanhoe Avenue, Suite 120
La Jolla, CA  92037
Telephone:     858-914-2001
Facsimile:      858-914-2002