## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRANCIS B. FREEMAN, JR., *et al.*, derivatively on behalf of TESLA, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 17-317-VAC-CJB |
| ELON MUSK, *et al.*, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| TESLA, INC., a Delaware corporation, | ) ) | |
| Nominal Defendant. | ) ) | |
| ARKANSAS TEACHER RETIREMENT SYSTEM, *et al.*, derivatively on behalf of TESLA, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 17-461-VAC-CJB |
| ELON MUSK, *et al.*, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| TESLA, INC., a Delaware corporation, | ) ) | |
| Nominal Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

In these related shareholder derivative suits (referred to herein as the "*Freeman* Action"

and the "*Arkansas* Action," respectively), presently pending before the Court are competing

motions to consolidate the actions, appoint lead plaintiffs, and appoint lead counsel: Plaintiffs

Arkansas Teacher Retirement System, Boston Retirement System, Roofers Local 149 Pension

Fund, Oklahoma Firefighters Pension and Retirement System, KBC Asset Management NV,

ERSTE-SPARINVEST Kapitalanlagegesellschaft m.b.H., and Stichting Blue Sky Active Large

Cap Equity Fund USA's (collectively, the "Arkansas Plaintiffs")[1] Motion for Consolidation and

to Appoint Co-Lead Plaintiffs and Co-Lead Counsel ("Arkansas Motion"), (D.I. 14; *Arkansas*

Action, D.I. 10),[2] and Plaintiffs Francis B. Freeman, Jr. and Marnie Walski McMahon's

(together, the "Freeman Plaintiffs") Motion to Consolidate Related Derivative Actions, to

Appoint Francis B. Freeman, Jr. and Marnie Walski McMahon as Co-Lead Plaintiffs, and to

Appoint Bottini & Bottini, Inc. as Lead Counsel ("Freeman Motion"), (D.I. 19; *Arkansas* Action,

D.I. 16).  Both the Arkansas Plaintiffs and Freeman Plaintiffs agree that the actions should be

consolidated.  (D.I. 16 at 4, 9; D.I. 20 at 1, 7-8)  The individual Defendants ("Individual

Defendants")[3] and nominal Defendant Tesla, Inc. ("Tesla[,]" and together with the Individual

Defendants, "Defendants") have not filed responses to either motion and presumably take no

position on the motions.

    For the reasons stated below, the Court GRANTS-IN-PART the Freeman Motion to the

extent it seeks consolidation of the *Freeman* Action and *Arkansas* Action, DENIES-IN-PART

---

[1]    Aaron Rocke, a named Plaintiff who joined the Complaint in the *Arkansas* Action, supports the Arkansas Motion but does not seek appointment as a Co-Lead Plaintiff. (D.I. 16 at 1 n.1)

[2]    Both sets of motions and briefs were filed in both actions.  Citations herein, unless otherwise noted, are to the docket in the earlier-filed *Freeman* Action.

[3]    The Individual Defendants in both actions are seven current and/or former Tesla, Inc. officers and directors:  Elon Musk, Brad W. Buss, Ira Enrenpreis, Antonio J. Gracias, Stephen T. Jurvetson, Robyn M. Denholm, and Kimbal Musk.  (D.I. 1; *Arkansas* Action, D.I. 2)

the Freeman Motion to the extent it seeks appointment of the Freeman Plaintiffs as Co-Lead

Plaintiffs and Bottini & Bottini, Inc. as Lead Counsel, and GRANTS the Arkansas Motion in its

entirety.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Complaints and Their Allegations

The Freeman Plaintiffs filed the Freeman Complaint against Defendants on March 24,

2017. (D.I. 1) In it, they asserted violations of Sections 14(a) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), violations of United States Securities and

Exchange Commission Rule 14a-9 (together with the Exchange Act claims, the "federal

securities claims" or "federal claims"), and state law causes of action for breach of fiduciary

duties and unjust enrichment. (D.I. 1) The Arkansas Plaintiffs filed the Arkansas Complaint

against Defendants on April 21, 2017 and asserted the same types of claims as those asserted in

the *Freeman* Action, plus a claim for waste of Tesla's assets. (*Arkansas* Action, D.I. 2)

The allegations in the Complaints relate to Tesla's acquisition of SolarCity Corporation

("SolarCity") in 2016.[4] (*See, e.g.*, D.I. 1 at ¶¶ 4-5; *Arkansas* Action, D.I. 2 at ¶¶ 3-4) Tesla is an

automobile manufacturer headed by Defendant Elon Musk, who is the chairman of the Tesla

Board of Directors, its Chief Executive Officer, and its largest shareholder. (D.I. 1 at ¶¶ 11, 39;

*Arkansas* Action, D.I. 2 at ¶¶ 2, 21, 63, 154) SolarCity was founded by Peter Rive and Lyndon

---

[4]      The allegations that follow are ones common to both Complaints. Prior to either
Complaint being filed, the Arkansas Plaintiffs and their counsel filed a request for books and
records from Tesla pursuant to Section 220 of the Delaware General Corporation Law ("Section
220"). (D.I. 16 at 2) The Arkansas Plaintiffs claim that, in response, Tesla produced over 1,800
pages of confidential documents that, in turn, were utilized in the drafting of the Arkansas
Complaint. (*Id.*) The relevance of the allegations based on the Section 220 documents is
discussed further below.

Rive, Elon Musk's cousins.  (D.I. 1 at ¶¶ 11, 26; *Arkansas* Action, D.I. 2 at ¶¶ 3, 7, 25, 65)

SolarCity is in the business of leasing solar panel equipment to residential and commercial

customers.  (D.I. 1 at ¶ 19; *Arkansas* Action, D.I. 2 at ¶¶ 66, 182)

The Complaints allege that, at the time of the acquisition of SolarCity by Tesla, Elon

Musk was chairman of the SolarCity Board of Directors and its largest shareholder.  (D.I. 1 at ¶

11; *Arkansas* Action, D.I. 2 at ¶¶ 3, 25, 65, 241)  In addition, the other Individual Defendants had

strong personal and financial ties to Elon Musk, and all of the Individual Defendants (aside from

Defendant Denholm) were substantial SolarCity stockholders.  (D.I. 1 at ¶¶ 16, 24; *Arkansas*

Action, D.I. 2 at ¶¶ 7, 32)

On June 21, 2016, Tesla announced that it had made an offer to acquire SolarCity,

assertedly at a "significant premium."  (D.I. 1 at ¶ 22; *see also Arkansas* Action, D.I. 2 at ¶¶ 3,

105)  On August 1, 2016, Tesla and SolarCity announced that they had executed a merger

agreement through which Tesla would acquire SolarCity.  (D.I. 1 at ¶ 35; *Arkansas* Action, D.I. 2

at ¶¶ 4, 147)  It is alleged that, at the time of the acquisition, "SolarCity had consistently failed to

turn a profit, had mounting debt, and was burning through cash at an unsustainable rate[,]"

having accumulated over $3 billion in debt during its 10-year existence, of which $1.5 billion

was to become due by the end of 2017.  (D.I. 1 at ¶ 20; *see also Arkansas* Action, D.I. 2 at ¶ 6)

The Individual Defendants allegedly benefitted from the acquisition (which both Complaints

refer to as a "bailout" of SolarCity)—an acquisition that is alleged to have redounded to the

detriment of Tesla and its shareholders.  (D.I. 1 at ¶¶ 7, 24, 39; *Arkansas* Action, D.I. 2 at ¶¶ 7-8,

11, 108, 154)

The Complaints allege that although the Individual Defendants had conflicts of interest

4

that prevented them from independently considering the SolarCity acquisition, they nevertheless did not form a special committee of independent directors to review the offer or the acquisition, nor did they retain separate financial or legal advisors.  (D.I. 1 at ¶ 25; *Arkansas* Action, D.I. 2 at ¶¶ 9, 96)  Additionally, it is alleged that on October 12, 2016, the Individual Defendants filed a materially false and misleading proxy statement that was intended to make the acquisition of SolarCity seem more attractive to the Tesla shareholders when it came time to vote on the acquisition.  (D.I. 1 at ¶¶ 6-7, 40-44, 46-97; *Arkansas* Action, D.I. 2 at ¶¶ 202-22)  More specifically, the proxy statement allegedly contained false statements asserting that the acquisition of SolarCity was aimed at achieving efficiencies or cost synergies (in that the combined company would generate cost savings from not having to operate on an arm's-length basis in affiliate transactions)—when in actuality the real reason for the acquisition "was to salvage the substantial investment of Elon Musk and other investors in Solar City."  (D.I. 1 at ¶¶ 42-44; *see also Arkansas* Action, D.I. 2 at ¶ 204)  Additionally, the proxy also allegedly:  (1) contained a false and misleading fairness opinion for the acquisition produced by Evercore Partners ("Evercore"); (2) failed to disclose Evercore's lack of independence; (3) concealed the pace and magnitude of the cash drain and expected restructuring charges at SolarCity; and (4) failed to disclose flaws in the process used by Tesla's Board in evaluating the SolarCity acquisition.  (D.I. 1 at ¶¶ 47-97; *Arkansas* Action, D.I. 2 at ¶¶ 202-235)

## B.    Prior Related Litigation in the Delaware Court of Chancery

Prior to the Complaints being filed, between September 1 and September 13, 2016, various Tesla shareholders—not including the Freeman or Arkansas Plaintiffs—filed actions in the Delaware Court of Chancery ("Chancery Court") concerning the acquisition of SolarCity.

5

(D.I. 16 at 2)  The Arkansas Plaintiffs, after having sought and obtained relevant documents pursuant to Section 220, thereafter filed a complaint in the Chancery Court (the "Chancery Court Action") on September 30, 2016.  (*Id.* at 3; D.I. 24 at 1)

On October 19, 2016, after opposition from the other Tesla shareholders, Vice Chancellor Joseph R. Slights III appointed the Arkansas Plaintiffs as co-lead plaintiffs, and Grant & Eisenhofer P.A., Kessler Topaz Melzer & Check, LLP, and Robbins Geller Rudman & Dowd LLP (the same counsel representing the Arkansas Plaintiffs here and who are seeking appointment as Co-Lead Counsel here) as co-lead counsel.  (D.I. 16 at 3; *see also id.*, ex. A)  The Court of Chancery Action remains ongoing.

## C.    The Filing of the Instant Motions

On May 4, 2017, the Arkansas Plaintiffs filed the Arkansas Motion in both the *Freeman* and *Arkansas* Actions.  (D.I. 14; *Arkansas* Action, D.I. 10)  The Freeman Plaintiffs likewise filed their competing motion in both actions on June 2, 2017.  (D.I. 19; *Arkansas* Action, D.I. 16) Briefing on both motions, which the parties handled in a consolidated fashion, was complete on July 14, 2017.  (D.I. 33; *Arkansas* Action, D.I. 30)  Both actions have been assigned to the Court and referred to the Court for handling through case-dispositive motions.

## II.    DISCUSSION

As their titles indicate, there are three issues raised in the Freeman Motion and the Arkansas Motion:  (1) whether the cases should be consolidated; (2) whether the Freeman Plaintiffs or the Arkansas Plaintiffs should be designated as Co-Lead Plaintiffs; and (3) whether the Freeman Plaintiffs' counsel or the Arkansas Plaintiffs' counsel should be designated Lead Counsel or Co-Lead Counsel.  The Court will address these issues in turn.

### A.   Consolidation

"If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions[.]" Fed. R. Civ. P. 42(a).  The Court has broad authority to consolidate actions for trial involving common questions of law or fact if, in its discretion, it finds that such consolidation would "facilitate the administration of justice." *Ellerman Lines, Ltd. v. Atl. & Gulf Stevedores, Inc.*, 339 F.2d 673, 675 (3d Cir. 1964); *see also KBC Asset Mgmt. NV ex rel. Chemed Corp. v. McNamara*, 78 F. Supp. 3d 599, 602-03 (D. Del. 2015); *Resnik v. Woertz*, 774 F. Supp. 2d 614, 624-25 (D. Del. 2011).  Although the existence of common questions of law or fact is a prerequisite to consolidation, their presence does not require consolidation pursuant to Federal Rule of Civil Procedure 42(a).  *Rohm & Haas Co. v. Mobil Oil Corp.*, 525 F. Supp. 1298, 1309 (D. Del. 1981).  Instead, in considering such a motion, the Court must balance any savings of time and effort gained through consolidation against any "inconvenience, delay, or expense" that may result.  *Id.*

Here, all parties agree that the two cases should be consolidated, and there is no dispute that both cases involve common questions of law and fact.  (D.I. 16 at 4, 9; D.I. 20 at 7-8; D.I. 21 ("Bottini Decl.") at ¶¶ 4-5)  Both actions were filed by shareholders of Tesla derivatively on behalf of the company, and the respective Defendants in both actions are identical.  (D.I. 16 at 4; D.I. 20 at 7)  Additionally, the various causes of action alleged in both Complaints are similar or the same.  All are premised on the alleged breach of fiduciary duties by the Individual Defendants, and the issuance of a materially false and misleading proxy statement, occurring in connection with Tesla's acquisition of SolarCity.  (*See* D.I. 16 at 4; D.I. 20 at 7)

For all of these reasons, the Court grants the request for consolidation of the *Freeman*

7

Action and *Arkansas* Action for all purposes, including pre-trial proceedings and trial. *See, e.g.*, *KBC Asset Mgmt.*, 78 F. Supp. 3d at 603; *Resnik*, 774 F. Supp. 2d at 625.

### B.   Designation of Lead Plaintiffs

Federal Rule of Civil Procedure 23.1(a) provides that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders . . . who are similarly situated in enforcing the right of the corporation[.]" Fed. R. Civ. P. 23.1(a). Here, there is no question that the competing Plaintiffs will "fairly and adequately" represent the shareholders' interests. The question instead is whether to appoint lead plaintiffs, and if so, which Plaintiffs will best represent shareholder interests.

### 1.   Should the Court Appoint Lead Plaintiffs?

Although no statutory authority exists for the appointment of a lead plaintiff in shareholder derivative actions like these, courts have the inherent "authority to appoint a lead plaintiff . . . in a derivative action in order to create an efficient case-management structure." *N. Miami Beach Gen. Emps. Ret. Fund v. Parkinson*, No. 10 C 6514, 2011 WL 12465137, at *1-2 (N.D. Ill. July 5, 2011) (appointing a lead plaintiff and lead counsel to avoid "the potential for disagreements and inefficiencies"); *see also Horn v. Raines*, 227 F.R.D. 1, 3 (D.D.C. 2005) (appointing, *inter alia*, a lead plaintiff in derivative actions, as it was "necessary to provide for an orderly litigation"). Here, although there are only two derivative actions at issue in this Court and only two competing sets of Plaintiffs, the Court finds that appointing a singular group of co-lead plaintiffs (and, relatedly, appointing lead counsel) would be beneficial.[5] While both of these

---

[5]     *See, e.g.*, *KBC Asset Mgmt.*, 78 F. Supp. 3d at 603 (appointing a lead plaintiff and consolidating two similar shareholder derivative actions); *Berg ex rel. Intuitive Surgical, Inc. v. Guthart*, Case Nos. 5:14-CV-00515-EJD, 5:14-CV-01307-EJD, 2014 WL 3749780, at *1-2, *7

federal actions are at the same early procedural posture, both groups of Plaintiffs acknowledge

that their respective pre-trial and trial strategies might diverge. (D.I. 20 at 17; D.I. 24 at 13; D.I.

33 at 1) And the briefing here also indicates that both sets of Plaintiffs have not been of like

mind on issues relating to these motions. Appointing co-lead plaintiffs in this instance would

help to create "an efficient, streamlined structure for directing this litigation" that avoids any

delays or inefficiencies resulting from disagreement over divergent viewpoints. *KBC Asset*

*Mgmt.*, 78 F. Supp. 3d at 603; *see also Lieblein ex rel. W. Union Co. v. Ersek*, Civil Action No.

14-cv-00144-MSK-KLM, 2015 WL 73815, at *1 (D. Colo. Jan. 5, 2015) (finding that

designating a lead plaintiff in a shareholder derivative action would avoid the "unnecessary

duplication" of efforts that would result from allowing each named plaintiff to proceed on behalf

of the same shareholders).

## 2.    Which Set of Competing Lead Plaintiffs Will Best Represent Shareholder Interests?

Next, the Court assesses which set of Plaintiffs should be chosen as lead plaintiffs. First,

it will examine the question of which factors the Court should utilize in making that decision.

Thereafter, it will go on to address relevant factors suggested by the parties.

### a.    What Factors Should the Court Utilize?

In *KBC Asset Mgmt. NV ex rel. Chemed Corp. v. McNamara*, 78 F. Supp. 3d 599 (D. Del.

2015), a matter that was at a similar procedural posture as are the instant cases, the Court

considered the following five factors when designating lead plaintiffs in consolidated shareholder

(N.D. Cal. July 30, 2014) (same); *Clark ex rel. DaVita, Inc. v. Thiry*, Civil Action No.
12–cv–2074–WJM–CBS, Civil Action No. 13–cv–1308–WJM–MJW, 2014 WL 4050057, at *1,
*4 (D. Colo. Jan. 7, 2014) (same); *Sexton ex rel. Jones Soda Co. v. Van Stolk*, No. C07-
1782RSL, 2008 WL 1733242, at *1, *3 (W.D. Wash. Apr. 10, 2008) (same).

derivative actions: "(1) which plaintiff has the largest financial interest; (2) the preference for institutional investors to lead a lawsuit for shareholders; (3) the quality of the pleadings; (4) the vigor with which the plaintiff has pursued the suit; and (5) the plaintiff's arrangement on the payment of attorney's fees." *KBC Asset Mgmt.*, 78 F. Supp. 3d at 604. The Court considered these factors in *KBC Asset Mgmt.* because: (1) a number of other federal courts had considered the same five factors in similar cases, *see, e.g.*, *Berg ex rel. Intuitive Surgical, Inc. v. Guthart*, Case Nos. 5:14-CV-00515-EJD, 5:14-CV-01307-EJD, 2014 WL 3749780, at *4-7 (N.D. Cal. July 30, 2014); *N. Miami Beach*, 2011 WL 12465137, at *1; *Dollens ex rel. Westell Techs., Inc. v. Zionts*, Nos. 01 C 5931, 01 C 2826, 2001 WL 1543524, at *5-6 (N.D. Ill. Dec. 4, 2001); and (2) both sets of competing co-lead plaintiffs in the case specifically addressed the applicability of these five factors in their briefing, *see KBC Asset Mgmt.*, 78 F. Supp. 3d at 604.

In their briefing regarding the instant motions, the Arkansas Plaintiffs specifically address the applicability of the five *KBC Asset Mgmt.* factors. (D.I. 16 at 10-17; D.I. 24 at 3-12) The Freeman Plaintiffs, on the other hand, largely did not address these factors. Instead, they noted that courts "'generally consider various factors' in determining which plaintiff would 'best serve the interests of the corporation and its shareholders and most effectively prosecute the litigation.'" (D.I. 20 at 9 (quoting *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1151 (Del. 2011))). The Freeman Plaintiffs went on to discuss three factors that they deemed most significant here: (1) the "relative economic stakes" of the competing Plaintiffs in the outcome of the litigation; (2) the fact that the Freeman Plaintiffs are "willing and able to oversee this litigation on behalf of Tesla and its public stockholders[;]" and (3) the fact that the Freeman Plaintiffs were the first stockholders to bring federal securities claims. (*Id.* at 9-11)

10

The five *KBC Asset Mgmt.* factors are surely relevant to the question at hand, and so the

Court will consider them first here. But nowhere in *KBC Asset Mgmt.* did the Court state that the

five factors considered there were the *only* factors that might bear on this inquiry. If there are

other factors raised that are relevant to determining which of a competing set of potential lead

plaintiffs would best represent shareholders in consolidated derivative actions, then the Court

should consider them. *See Berg*, 2014 WL 3749780, at \*4-5; *Nicolow v. Hewlett Packard Co.*,

No. 12-05980 CRB, 2013 WL 792642, at \*7-8 (N.D. Cal. Mar. 4, 2013).

Thus, after assessing the *KBC Asset Mgmt.* factors, the Court will also look at the other

three factors raised by the Freeman Plaintiffs. To the extent it finds those factors relevant to the

analysis here, the Court will consider how they affect the overall calculus.

### b.   The *KBC Asset Mgmt.* Factors

#### i.   "Which plaintiff has the largest financial interest"

As to the first *KBC Asset Mgmt.* factor—which plaintiff has the largest financial

interest—courts have recognized that "financial stake has some relevance to the plaintiff's

interest in a derivative action and the likelihood that the plaintiff will pursue the derivative

claims vigorously." *In re Foundry Networks, Inc. Derivative Litig.*, No. C-06-05598 RMW,

2007 WL 485974, at \*1 (N.D. Cal. Feb. 12, 2007) (finding this factor to favor a group of

plaintiffs that held at least 2,700 shares in the corporation at issue over a plaintiff who owned 666

shares). As of June 2017, the Arkansas Plaintiffs collectively held 70,007 shares[6] of Tesla

common stock. (D.I. 24 at 2 n.4) This is compared to the Freeman Plaintiffs, who as of March

---

[6]      (*See* D.I. 25 ("Hopkins Decl.") at ¶ 4; D.I. 26 ("Smyth Decl.") at ¶ 4; D.I. 27
("Reischl Decl.") at ¶ 4; D.I. 28 ("Demunter Decl.") at ¶ 4; D.I. 29 ("Jones Decl.") at ¶ 4; D.I. 30
("LaDuke Decl.") at ¶ 4; D.I. 31 ("Paanen Decl.") at ¶ 4))

2017 owned approximately 3,886 shares.  (D.I. 1 at ¶¶ 8-9; D.I. 20 at 10, 14-15; Bottini Decl. at ¶ 6; D.I. 22 ("McMahon Decl.") at ¶ 3; D.I. 33 at 7)

Thus, it is undisputed that the Arkansas Plaintiffs own nearly 20 times more shares of Tesla common stock than do the Freeman Plaintiffs.  It is a significant disparity, and it underscores that, at least viewed in absolute dollar value terms, the Arkansas Plaintiffs have much more to gain or lose by Tesla's success or failure than do the Freeman Plaintiffs.  And that, in turn, could be said to give them greater motivation to police this suit effectively.  Thus, this factor weighs in favor of the Arkansas Plaintiffs' motion.  *See KBC Asset Mgmt.*, 78 F. Supp. 3d at 604 (finding that the largest financial interest factor clearly fell in favor of a plaintiff that held over 150 times more shares than did the competing plaintiff); *N. Miami Beach*, 2011 WL 12465137, at *1 ("[T]his factor does tip in [one plaintiff's] favor, particularly where [that plaintiff] owns more than double the number of shares that [the competing plaintiffs] own individually."); *see also Chester Cty. Emps.' Ret. Fund v. White*, No. 11 C 8114, 2012 WL 1245724, at *3 (N.D. Ill. Apr. 12, 2012).

### ii.     "The preference for institutional investors to lead a lawsuit for shareholders"

The second *KBC Asset Mgmt.* factor relates to institutional investor status.  *Dollens*, 2001 WL 1543524, at *5 (suggesting that as to this factor, a court should examine not just the fact of a party's institutional investor status, but whether the particulars of that status gave it "any greater incentive to litigate this case than [would] any other plaintiff who seeks to lead").  This is not a case that implicates the Private Securities Litigation Reform Act ("PSLRA"),[7] but even in

---

[7]      The PSLRA relates to fraud class actions filed under the Exchange Act and the Securities Act of 1933.  *Dollens*, 2001 WL 1543524, at *4.  In appointing a lead plaintiff in

derivative actions, courts have recognized something of a preference for an institutional investor lead plaintiff. In doing so, they have noted that an institutional investor "acting as lead plaintiff can, consistent with its fiduciary obligations, balance the interest of the [shareholders] with the long-term interests of the company and its public investors." *Horn*, 227 F.R.D. at 3 (internal quotation marks and citations omitted); *see also Dollens*, 2001 WL 1543524, at *5. Institutions with that kind of large stake in an action (like the Arkansas Plaintiffs here) may be better able to negotiate fair and reasonable resolutions for all plaintiffs than might an individual plaintiff who has less time or a lesser ability to properly supervise lead counsel. *See Dollens*, 2001 WL 1543524, at *5; *cf.* S. Rep. No. 104-98, at 690 (1995) (*cited in Horn*, 227 F.R.D. at 3).

Here, it is undisputed that the Arkansas Plaintiffs are all large institutional investors. (*See* D.I. 16 at 12; D.I. 33 at 9) And consistent with the reasons behind giving preference to institutional investors, representatives of all of the Arkansas Plaintiff entities submitted declarations under the penalty of perjury indicating that they "owe[] a fiduciary duty to Tesla and its stockholders and [are] committed to continuing to actively direct this litigation through its successful completion." (Hopkins Decl. at ¶ 6; Smyth Decl. at ¶ 6; Reischl Decl. at ¶ 6; Demunter Decl. at ¶ 6; Jones Decl. at ¶ 6; LaDuke Decl. at ¶ 6; Paanen Decl. at ¶ 6)

Thus, this factor weighs in favor of appointing the Arkansas Plaintiffs as Co-Lead Plaintiffs.

### iii.    "The quality of the pleadings"

---

shareholder derivative actions, courts have sometimes taken into account the statutory criteria used to govern the appointment of a lead plaintiff in PSLRA actions, including the preference for institutional investors and investors with a larger financial stake in the litigation. *See id.*; *see also Chester Cty. Emps.' Ret. Fund*, 2012 WL 1245724, at *3.

The third *KBC Asset Mgmt.* factor relates to the quality of the pleadings. *See In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849 (NGG)(RER), 2006 WL 3511375, at *5 (E.D.N.Y. Dec. 5, 2006) (noting that the "pleadings serve as an accurate and appropriate barometer through which the court can assess which firm would best represent the interests of the shareholders and the rights of the corporation"). Without making any statement as to the legal merit of the claims in the respective Complaints, the Court can say that both Complaints appear to be of a high quality, in the sense that they both contain many detailed factual allegations relating to the alleged wrongs at issue. *N. Miami Beach*, 2011 WL 12465137, at *2.

The parties have two disputes going to which Complaint is of a higher quality. The Court will address each in turn.

First, the Arkansas Plaintiffs argue that their Complaint is superior because it incorporates more detail than does the Freeman Plaintiffs' Complaint—detail key to understanding the strength of the claims set out within. More specifically, the Arkansas Plaintiffs point out that their Complaint, *inter alia*: (1) incorporates non-public information drawn from the over 1,800 pages of confidential documents that they obtained from Tesla, pursuant to their Section 220 request;[8] (2) includes allegations (related in part to the content of

---

[8]     With regard to the Section 220 documents, the Arkansas Plaintiffs explain that, *inter alia*, these documents indicated that SolarCity was facing a liquidity crisis throughout 2016, and that this, in turn, better helps explain: (1) why Elon Musk was motivated to get the Tesla Board to make an offer for SolarCity in that year; and (2) how Elon Musk (who, as a member of the SolarCity Board, knew about SolarCity's dire financial condition before members of the Tesla Board) convinced Tesla's Board to make an initial offer for SolarCity—before the Tesla Board learned of SolarCity's true financial picture. (D.I. 16 at 13-14 (citing *Arkansas* Action, D.I. 2 at ¶¶ 72-74, 86-91, 93-95, 100-04, 106, 121-43))

the Section 220 documents) regarding deficiencies in Evercore's fairness opinion[9] that the

Freeman Plaintiffs failed to allege; (3) includes allegations (related in part to the content of the

Section 220 documents) regarding SolarCity's dire pre-merger financial situation;[10] and (4)

includes allegations exposing improper accounting of solar tax credits, which make up almost

half of SolarCity's revenue.[11]  (D.I. 16 at 12-16)  The Arkansas Plaintiffs assert that such

allegations—not found in the Freeman Plaintiffs Complaint—make their Complaint "better able

to withstand not only a motion to dismiss on demand futility[[12]] but also [better able to show the

lack of] sufficiency of the disclosures in the proxy materials."  (D.I. 24 at 9)

    For their part, the Freeman Plaintiffs do not dispute that the Arkansas Plaintiffs'

---

[9]      These deficiencies are said to include Evercore's alleged selection of an overly
optimistic range for a perpetuity growth rate.  This range allegedly fails to sufficiently take into
account certain Congressional changes made to the federal solar investment tax credit—changes
that, over time, were going to cause financial harm to SolarCity's business model.  (D.I. 16 at 14-
15 (citing *Arkansas* Action, D.I. 2 at ¶¶ 182-87, 192-95))

[10]      As noted above, *see supra* note 8, these are allegations that, throughout 2016,
SolarCity was facing a liquidity crisis, in part because the company could not maintain a required
minimum cash balance required by SolarCity's revolving credit facility (the "Revolver").  (D.I.
16 at 15-16 (citing *Arkansas* Action, D.I. 2 at ¶¶ 72, 74))  It is alleged that failure to satisfy that
cash balance could have resulted in cross defaults by SolarCity in other debt instruments in its
capital structure.  (*Id.*)  The Arkansas Plaintiffs also alleged that in 2016, SolarCity faced the
prospect of defaulting on its nonrecourse debt, which could, in turn, trigger a cross-default under
the Revolver.  (*Id.* (citing *Arkansas* Action, D.I. 2 at ¶¶ 73, 74))

[11]      *See supra* note 9.

[12]      "Demand futility" refers to the requirement that a shareholder bringing a
derivative suit on behalf of a corporation—a demand that displaces the Board's authority to
manage the business and affairs of the corporation—must "either plead that the board wrongfully
refused a demand to bring suit or that it would have been futile to make such a demand."  *Clark*,
2014 WL 4050057, at *2 (quoting *South v. Baker*, 62 A.3d 1, 13-14 (Del. Ch. 2012)); *see also In
re Chemed Corp. S'holder Derivative Litig.*, Civil Action No. 13-1854-LPS-CJB, 2015 WL
9460118, at *7-8 (D. Del. Dec. 23, 2015), *adopted by KBC Asset Mgmt. NV ex rel. Chemed
Corp.*, Civil Action No. 13-1854-LPS-CJB, 2016 WL 2758256 (D. Del. May 12, 2016).

Complaint contains the above-referenced detail (drawn in part from the Section 220 documents) and that their Complaint does not. Instead, they argue that these additional allegations "are unlikely to make a material difference in the demand-futility analysis" because there was "ample publicly-available information [to] demonstrate[] that all Tesla directors lacked independence and were beholden to Elon Musk." (D.I. 20 at 16-17; *see also* D.I. 33 at 4-5)

The Freeman Plaintiffs' argument here—i.e., that either Complaint would survive a motion to dismiss on demand-futility grounds—misses the mark. The question is not whether the content of one or both Complaints would or should be sufficient to jump over that hurdle.[13] Instead, is about the *relative quality* of the two pleadings. The Court can reasonably infer that a complaint containing more detailed allegations on matters of core concern is *generally* in a *relatively stronger position* to fend off a hostile motion relating to demand futility, as compared to a complaint containing less such detail. And here, the Court concludes that this increased level of detail does render the Arkansas Complaint superior in a meaningful way. *See, e.g., Clark ex rel. DaVita, Inc. v. Thiry*, Civil Action No. 12-cv-2074-WJM-CBS, Civil Action No. 13-cv-1308-WJM-MJW, 2014 WL 4050057, at *2 (D. Colo. Jan. 7, 2014) (finding that one complaint containing "particular allegations" was superior to another containing "only general allegations" on a matter relevant to demand futility, and that the superior complaint also benefitted "due to the inclusion of allegations resulting from [Section 220] documents"); *N. Miami Beach*, 2011 WL 12465137, at *2 (finding a complaint that was bolstered by Section 220 documents "ha[d] the advantage" over one that was not); *cf.* (D.I. 16, ex. A at 46 (Vice

---

[13]      Again, the Court notes that it is not here prejudging the answer to that question, and takes no position on whether either Complaint would survive such a motion.

Chancellor Slights noting, in the Chancery Court Action, that the Arkansas Plaintiffs' complaint there included facts relating to material obtained through "Section 220 demands" that have "enhanced the quality of th[at complaint] in a meaningful way" and that "potentially relate to demand futility and perhaps other motion practice that might be initiated down the road")).

Second, the Freeman Plaintiffs assert that their Complaint is of superior quality not "merely because it was first-filed,[14] but because [they] were able to identify and draft the important and valuable federal claims—a task that the [Arkansas] Plaintiffs [] failed to accomplish even after having participated in the . . . Chancery Court [proceedings] for over half a year." (D.I. 33 at 4) They argue that "by copying the [Freeman] Plaintiffs' federal claims, the [Arkansas] Plaintiffs all but concede that the quality of the [Freeman] Plaintiffs' complaint is superior." (*Id.*)

The Court does not really follow this line of argument. The fact that the Arkansas Plaintiffs' Complaint also includes the same type of federal claims as did the Freeman Plaintiffs' Complaint—in and of itself—does not seem like a concession that the Freeman Plaintiffs' Complaint "is superior." It just seems like this is a scenario where two sets of competing Plaintiffs each brought the same kinds of federal claims in federal court—presumably because both sets of Plaintiffs feel that those claims are viable. Now, things might be different if this were a case, for example, where the Arkansas Plaintiffs had: (1) sat on their hands and waited until the Freeman Plaintiffs had filed a complaint relating to the Solar City acquisition; (2) only to thereafter file a copycat complaint repeating verbatim the same factual allegations found in the

---

<sup>14</sup>     The Court will take up below what impact, if any, the "first-to-file-in-federal court" status of the Freeman Plaintiffs' Complaint should have in this analysis.

Freeman Plaintiffs' Complaint. In that scenario, such activity might suggest that the Arkansas Plaintiffs' pleading was of an overall lesser quality. *See KBC Asset Mgmt.*, 78 F. Supp. 3d at 606 (citing *Dollens*, 2001 WL 1543524, at *5)).

But that did not happen here. While it is true that the Arkansas Plaintiffs used similar wording to the Freeman Plaintiffs in the counts of their Complaint that set out federal securities violations, (D.I. 33 at 4), it appears that all but one of the hundreds of paragraphs of factual allegations in the Arkansas Plaintiffs' Complaint are different than (and often, more factually detailed than) those found in the Freeman Plaintiffs' Complaint. (*See generally* D.I. 1 & *Arkansas* Action D.I. 2; *compare* D.I. 1 at ¶ 25, *with Arkansas* Action, D.I. 2 at ¶ 9) And the Freeman Plaintiffs were not the first of the parties here to develop factual allegations and legal claims relating to the SolarCity acquisition. The Arkansas Plaintiffs were already litigating the Chancery Court Action well before the Freeman Plaintiffs filed their Complaint in federal court. (D.I. 24 at 10-11)

For these reasons, the quality of the pleadings factor supports the Arkansas Plaintiffs' motion.

### iv.    "The vigor with which the plaintiff has pursued the suit"

The fourth *KBC Asset Mgmt.* factor relates to the vigor with which the respective Plaintiffs have pursued their suits. "Courts generally prefer a party that has consistently sought to move the case forward in a productive manner." *Berg*, 2014 WL 3749780, at *7.

The Arkansas Plaintiffs argue that they have been litigating their claims with greater vigor, in part because: (1) they began investigating Defendants' alleged misconduct quickly (leading to their initial complaint in the Chancery Court Action, which they have also pursued via

the discovery process); (2) they were the only plaintiffs to utilize their Section 220 rights to

inspect Tesla's books and records and to use the results to bolster their claims against

Defendants; and (3) they have worked together cooperatively in the Chancery Court Action and

in this case. (D.I. 16 at 17; D.I. 24 at 7-8)  The Court agrees with the decisions of other courts

finding that such efforts are evidence of vigorous prosecution. *See, e.g.*, *Clark*, 2014 WL

4050057, at *4 (noting that plaintiff's Section 220 request demonstrated its "greater vigor with

regard to the prosecution of th[e] case"); *Dollens*, 2001 WL 1543524, at *6 (finding that a

plaintiff's filing of numerous discovery requests showed that it was more vigorously prosecuting

the case).

    For their part, the Freeman Plaintiffs argue that the Arkansas Plaintiffs have not "revealed

whether they intend to actively pursue the federal claims in coordination with the state-court

proceedings or to simply seek a stay of the federal proceedings pending resolution of the state-

court proceedings[,] . . . [which] casts serious doubt as to their willingness and ability to lead the

proceedings in this Court." (D.I. 33 at 5; *see also* D.I. 20 at 17; Bottini Decl. at ¶¶ 14, 15)  And

indeed, the Arkansas Plaintiffs admit that they "have not decided which strategy they will follow

to facilitate the most efficient handling of these cases." (D.I. 24 at 12)  However, the Arkansas

Plaintiffs argue that this decision should not affect the Court's "vigor" analysis, and they note

that the Freeman Plaintiffs have cited to no case law suggesting that it should. (*Id.*)

    On this point, the Court largely agrees with the Arkansas Plaintiffs. The decision as to

how lead plaintiffs should proceed in federal court while also pursuing a parallel related state

court action seems less about the "vigor" with which those plaintiffs are pursuing underlying

legal claims on behalf of the corporation, and more like a tactical or strategic decision as to how

to best and most efficiently press all of those claims. *Cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2013 WL 4399215, at *4 (S.D.N.Y. Aug. 13, 2013) (noting that tactical decisions, such as which claims to assert, "are the prerogative of a lead plaintiff") (internal quotation marks and citation omitted); (D.I. 16, ex. A at 45).[15]

The Freeman Plaintiffs also note that they were the first to "identify, draft, and file [the] federal claims" (e.g., alleged violations of Sections 14(a) and 20(a) of the Exchange Act) in the case. (D.I. 20 at 11)  For reasons discussed below, *see supra* Section II(B)(2)(c)(iii), the Court does not necessarily think that being "first-to-file" (without more) is particularly relevant to assessing whether the Freeman Plaintiffs are superior plaintiffs to the Arkansas Plaintiffs. That said, the Court can see how the Freeman Plaintiffs' efforts to identify and bring these federal claims says something about the work that they are willing to put in to seek legal redress on behalf of the corporation and its shareholders.[16]

In the end, there is evidence that both sets of Plaintiffs would vigorously pursue this litigation. The evidence favoring the Freeman Plaintiffs seems more robust, and so the Court finds this factor to favor their motion.

### v.   "The plaintiff's arrangement on the payment of attorney's fees"

The fifth *KBC Asset Mgmt.* factor is the plaintiff's arrangement on the payment of

---

[15]     Moreover, it is worth noting that it is not clear that the Arkansas Plaintiffs will actually seek to stay the instant litigation were they named Co-Lead Plaintiffs—nor it is clear that if they did so, the Court would actually grant such a request.

[16]     The Court takes no position on whether these federal securities claims will, as the Freeman Plaintiffs suggest, (D.I. 20 at 11-12), end up being easier to prove here than the state law claims.

attorney's fees. Arkansas Plaintiffs' counsel has indicated that the Arkansas Plaintiffs negotiated their attorneys fees in arms-length transactions, *see N. Miami Beach*, 2011 WL 12465137, at *2, and states that they would be "willing 'to accept the court's decision concerning a reasonable fee'" and would strive to "avoid any 'duplication of effort by counsel.'" (D.I. 16 at 16-17 (quoting *Dollens*, 2001 WL 1543524, at *6)) The Court has no indication that the situation with the Freeman Plaintiffs and their counsel is any different. Thus, this factor is neutral.

### c.   Other Factors Suggested by the Freeman Plaintiffs

As noted above, the Freeman Plaintiffs cited to three other factors that they felt the Court should consider in making a decision on lead plaintiff status. The Court takes up each below.

#### i.   The "relative economic stakes" of the competing plaintiffs

While admitting that the Arkansas Plaintiffs hold the greater absolute number of shares, the Freeman Plaintiffs argue that the Court should consider the "relative economic stakes" as well. (D.I. 20 at 9-10, 14-16) That is, they urge the Court to look at the magnitude of the respective Plaintiffs' ownership of Tesla stock as it compares to: (1) the size of that Plaintiff's overall holdings or portfolio; and (2) the total number of outstanding shares of the corporation. (*Id.*)

The Court can see why an analysis of the relative size of a plaintiff's holdings in the company at issue, as compared to the size of that plaintiff's entire portfolio, is a factor worth considering in this analysis. After all, a plaintiff whose holdings in the company at issue make up a significant percentage (or all) of his total holdings might be particularly well-motivated to pursue shareholder derivative litigation, in light of how significant an impact the company's share price has on the value of his overall portfolio. *See, e.g., Berg*, 2014 WL 3749780, at *5

21

(considering this "relative size" factor, in addition to considering which plaintiff has a larger

absolute number of shares, in the lead plaintiff analysis, and ultimately determining in that case

that the financial interest of the plaintiff with a "greater relative stake" was more significant to

the lead plaintiff analysis "[b]ecause his [company] stock represents such a large percentage of

his portfolio, [and so that plaintiff] will certainly be motivated to pursue this case vigorously").

Here, as noted above, the Arkansas Plaintiffs together own just over 70,000 shares of

Tesla common stock. Each such Plaintiff does not disclose what percent of their total holdings

are made up of their Tesla stock holdings. For their part, the Freeman Plaintiffs disclose that

Freeman owns 3,861 shares of Tesla stock (which, as of May 2017, were valued at over $1.3

million) and that McMahon owns 25 shares. (D.I. 20 at 10; Bottini Decl. at ¶ 6; McMahon Decl.

at ¶ 3) They also disclose that McMahon's shares make up 60% of her stockholding portfolio.

(D.I. 20 at 10; McMahon Decl. at ¶ 3) But they do not provide information indicating what

percentage of Freeman's portfolio is comprised of Tesla stock.

In the Court's view, this record is somewhat helpful to the Freeman Plaintiffs. The Court

is prepared to infer (as the Freeman Plaintiffs urge it to) that Freeman's holdings "represent[] a

substantial investment for [this] individual investor[] that would motivate [him] to closely

supervise counsel and to vigorously prosecute this derivative action." (D.I. 20 at 14 (emphasis

omitted)); *cf. Wiehl v. Eon Labs*, No. Civ.A. 1116-N, 2005 WL 696764, at *3 (Del. Ch. March

22, 2005) (finding that an individual plaintiff's ownership of 1,000 shares having a market value

in excess of $30,000 was a basis to allow the court to "suppose[] that this investment is of some

significance to [the plaintiff], an individual investor, and would cause him to monitor his

counsels' conduct of the litigation"). That said, this factor might have helped the Freeman

22

Plaintiffs more had Freeman provided additional information about his portfolio—i.e., about how

the amount of his Telsa shares compares to his *overall* investment assets. As for McMahon, the

Court is not persuaded that her relatively small financial investment in Tesla will make her more

likely to vigorously litigate these derivative claims than will the Arkansas Plaintiffs, who have a

combined investment of approximately $23 million. (D.I. 16 at 11)

   As for the Arkansas Plaintiffs, the Court can reasonably infer that they each have

significantly more stock assets under their management than does Freeman or McMahon. (D.I.

20 at 15 n.5 ("[T]he [Arkansas Teacher Retirement System] website indicates that it manages

over $14 billion in assets as of August 2016.")) And so it is probably the case that the Arkansas

Plaintiffs' number of Telsa shares—as a percentage of their entire stock portfolio—is much

smaller than that of Freeman or McMahon.[17]   That does not, however, necessarily mean that the

---

[17]    There is some federal and Delaware state case law, cited here by the Freeman
Plaintiffs, that can be read to suggest that where none of competing lead plaintiffs own a large
percentage of the total number of outstanding shares of the company, then a court's analysis of
the plaintiffs' financial stake in the company should not typically favor any plaintiff. *See* (D.I. 20
at 15-16) (citing cases); *see also Wiehl*, 2005 WL 696764, at *3. Here, it appears that as
compared to Tesla's approximately 161 million outstanding shares (as of May 2017), none of the
proposed lead plaintiffs owns a large percentage of that whole. (D.I. 20 at 16 & n.7) But the
Court agrees with the Arkansas Plaintiffs, (D.I. 24 at 4-5), that even when none of the competing
plaintiffs hold a large percentage of the total number of outstanding shares of a company's stock,
a court should still look hard at other aspects of stock ownership (e.g., total number of shares
owned, total value of those holdings, total number of shares owned relative to the remainder of
one's portfolio) to see whether conclusions can still be drawn as to which plaintiff is a better
proposed lead plaintiff. After all, it will likely be "a very rare case where any movant holds a
significant percentage of the shares of a large public company." (D.I. 24 at 5 (emphasis omitted))
And the Court can think of a number of scenarios where, even though no proposed lead plaintiff
may hold a great percentage of the whole, one plaintiff's financial stake in the company at issue
will still seem to provide it with a greater incentive to participate in the litigation and monitor his
or her counsel. *Cf. Dutiel v. Tween Brands, Inc.*, Civil Action Nos. 4743-CC, 4845-CC, 2009
WL 3494626, at *3 (Del. Ch. Oct. 28, 2009) (cautioning against use of any "bright-line rule"
when evaluating proposed lead plaintiffs' financial stake in a company).

Arkansas Plaintiffs will not be vigorous litigants (for the reasons set out in Section II(B)(2)(b)(ii)).

In sum, although the Court lacks good data on how big a percentage of Freeman's total portfolio is made up of his Tesla stock holdings, it finds that information about his "relative" stock ownership bolsters the strength of the Freeman Plaintiffs' motion.

> ### ii.   The fact that the Freeman Plaintiffs are "willing and able to oversee this litigation on behalf of Tesla and its public stockholders"

The Freeman Plaintiffs next argue that, even though they are not institutional investors, the Court should nevertheless take into consideration their particular backgrounds, to the extent those backgrounds speak to the Freeman Plaintiffs' ability to well direct this litigation. They explain that they too "are willing and able to oversee this litigation on behalf of Tesla and its public stockholders." (D.I. 20 at 10 (citing Bottini Decl. at ¶ 7 and McMahon Decl. at ¶ 6)) And they note that: (1) Freeman and McMahon are educated and informed investors (with Freeman having a "background in business and finance") with substantial experience investing in the stock market; and (2) both worked closely with their counsel to review and file their Complaint. (*Id.*; *see also* Bottini Decl. at ¶ 7; McMahon Decl. at ¶¶ 2, 6)

From what it knows about them, the Court agrees that the Freeman Plaintiffs appear to be knowledgeable individual investors. But the question here is which set of Plaintiffs would *better* represent the interests of Tesla and its stockholders. As compared to a group of large institutional investors that all have significant experience with investment decision-making and with acting in a fiduciary capacity, the Freeman Plaintiffs' experience seems less significant. Moreover, the Arkansas Plaintiffs have already demonstrated in the Chancery Court Action that

they can work together to prosecute similar claims without incident; the Freeman Plaintiffs do not have that prior experience to cite to the Court. (D.I. 16 at 8)

For these reasons, the Freeman Plaintiff's background and experience does not move the needle in their favor.

### iii.   The fact that the Freeman Plaintiffs were the first to bring federal claims

The Freeman Plaintiffs argue that their Complaint is the better of the two because they were the first to bring the "valuable and important" federal securities claims. (D.I. 20 at 11-12; D.I. 33 at 2-3)

The Court is not persuaded that this proposed "first-to-the-courthouse" factor should have any impact here. Indeed, in analogous situations, federal courts (and Delaware state courts) have consistently declined to give preference to one plaintiff over another, simply because that plaintiff won a tight race to the courthouse. *See, e.g., Outten v. Wilmington Trust Corp.*, 281 F.R.D. 193, 199 (D. Del. 2012) (explaining that, in an Employee Retirement Income Security Act case, the first-to-file factor when appointing lead counsel has been rejected so as to avoid a race to the courthouse); *In re Century Bus. Servs. Sec. Litig.*, 202 F.R.D. 532, 536 (N.D. Ohio 2001) (noting that one of the purposes behind enactment of the PSLRA was to prevent "lawyer-driven litigation" that was on a "'first come, first serve' basis") (citation and emphasis omitted).[18] This conclusion seems especially on point here, where: (1) the Arkansas Plaintiffs filed their federal suit within a month of the Freeman Plaintiffs' federal suit; and (2) the Arkansas Plaintiffs had

---

[18]     *Cf. Hirt*, 2002 WL 1558342, at *2 ("The court has also recognized that no special weight or status will be accorded to a lawsuit 'simply by virtue of having been filed earlier than any other pending action'") (citation omitted); *TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, No. 18336, 2000 WL 1654504, at *3 (Del. Ch. Oct. 17, 2000).

earlier been litigating some of the underlying state law causes of action in the Chancery Court
Action (an action in which the Freeman Plaintiffs did not participate) prior to the filing of the
Freeman Plaintiffs' Complaint in this Court. (D.I. 24 at 1-2)

### d.   Conclusion

Ultimately, a greater number of the above factors weigh in the Arkansas Plaintiffs' favor,
and this supports the conclusion that they should be named Co-Lead Plaintiffs. The Arkansas
Plaintiffs have a large financial stake in Tesla's future, which should give them significant
motivation to be good stewards of these cases. As institutional investors, they also have
experience in playing the type of fiduciary role that lead plaintiffs are asked to take on in these
kinds of actions. And, as compared to the Freeman Plaintiffs, they have presented a higher-
quality complaint and have demonstrated more vigor in pressing underlying claims on behalf of
the corporation.

To be sure, the issue is not one-sided. Freeman also has a significant stake in Tesla for an
individual investor. And the Freeman Plaintiffs also seem as if they would be fine managers of
the cases. This is shown by the fact that they have filed a high-quality complaint and have
extended real effort in kick-starting this federal litigation.

But in the end, the Court concludes that the Arkansas Plaintiffs would be a stronger, safer
bet to fulfill the role of Co-Lead Plaintiffs.

### C.   Designation of Lead Counsel

Although the decision on a lead plaintiff should guide the Court's related decision as to
lead counsel, the Court will nevertheless analyze the parties' arguments on that issue as well.

"'The Court, if it sees fit, may appoint one or more attorneys as liaison counsel, lead

counsel, or trial counsel for the consolidated cases'" and "'can assign the designated lawyers specific responsibilities.'" *Resnik*, 774 F. Supp. 2d at 625 (quoting 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2385 (3d ed. 2008)). The selection of lead counsel in a shareholder derivative action filed in federal court is left to the sound discretion of the Court. *See id.*; *Horn*, 227 F.R.D. at 3. The Court must determine "'which counsel will best serve the interest of the plaintiffs' with respect to 'experience and prior success record, the number, size, and extent of involvement of represented litigations, the advanced stage of the proceedings in a particular suit, and the nature of the causes of action alleged.'" *Resnik*, 774 F. Supp. 2d at 625 (quoting 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 9.35 at 388 (4th ed. 2002)); *see also Horn*, 227 F.R.D. at 3. "Other factors include 'the quality of the pleadings, the economic interest of the plaintiffs, and the vigor with which the plaintiffs have prosecuted their lawsuits.'" *Resnik*, 774 F. Supp. 2d at 625-26 (citing Newberg & Conte, *supra* § 9.35 at 388).

The Arkansas Plaintiffs move to appoint Grant & Eisenhofer P.A., Kessler Topaz Melzer & Check, LLP, and Robbins Geller Rudman & Dowd LLP (collectively, "Arkansas Counsel") as Co-Lead Counsel. (D.I. 14; D.I. 16 at 17-20; D.I. 24 at 14) The Arkansas Plaintiffs contend that Arkansas Counsel is well qualified to represent the Tesla shareholders because of their "extensive experience in litigating stockholder actions" resulting in "significant monetary recoveries[,]" and their "demonstrated track record of working together to achieve some of the largest recoveries in Delaware." (D.I. 16 at 17-18 (citing cases)) They also note in support of appointment that they filed the superior complaint. (*Id.* at 19)

The Freeman Plaintiffs move to appoint Bottini & Bottini, Inc. ("Bottini & Bottini") as

lead counsel. (D.I. 19; D.I. 20 at 11-13; D.I. 33 at 2-6, 9; Bottini Decl. at ¶¶ 8-13; McMahon

Decl. at ¶ 7) They explain that Bottini & Bottini has "substantial experience prosecuting

stockholder derivative actions and has a demonstrated record of success." (Bottini Decl. at ¶ 10;

*see also* D.I. 20 at 13; D.I. 33 at 9; McMahon Decl. at ¶ 7) The Freeman Plaintiffs also assert

that Bottini & Bottini should be appointed lead counsel because they were the first to identify the

federal securities claims and are the only counsel to "show[] a real commitment to proceed with

the *federal* claims." (D.I. 33 at 5 (emphasis in original); *see also* D.I. 20 at 11-12)

The Court concludes, pursuant to Rule 42(a)(3), that Arkansas Counsel shall serve as Co-

Lead Counsel. In doing so, the Court acknowledges that each of the firms at issue have extensive

experience in complex litigation and have successfully represented shareholders in class and

derivative actions.

However, in the Court's view, Arkansas Counsel are better qualified to serve as Co-Lead

Counsel here for three reasons. First, the Court takes note that Arkansas Counsel has

demonstrated their ability to successfully work together and move litigation forward in the

Chancery Court Action—an action in which Vice Chancellor Slights has noted their

"extraordinary track record in representative litigation in [that] Court." (D.I. 16 at 8, 18-19; *see

also id.*, ex. A at 45) Second, the Court takes into account its earlier conclusion that although

both Complaints appear to be of a high quality, the Arkansas Complaint evidences a greater level

of investigatory effort due to the inclusion of allegations stemming from the Section 220 request.

Third, Arkansas Counsel are counsel of choice for the Co-Lead Plaintiffs, and that fact should be

afforded real weight in the Court's calculus. *See, e.g.*, *Berg*, 2014 WL 3749780, at *7; *Dollens*,

2001 WL 1543524, at *6.

28

## III.   CONCLUSION

For the reasons set forth above, the Court GRANTS-IN-PART the Freeman Motion to the extent it seeks consolidation of the *Freeman* Action and *Arkansas* Action, DENIES-IN-PART the Freeman Motion to the extent it seeks to appointment of the Freeman Plaintiffs as Co-Lead Plaintiffs and Bottini & Bottini as Lead Counsel, and GRANTS the Arkansas Motion in its entirety.   The Court will separately enter an Order of Consolidation and Appointment of Co-Lead Plaintiffs, and Co-Lead Counsel, which will largely mirror the proposed Order put forward by the Arkansas Plaintiffs, (D.I. 14), as that proposed Order appears to generally track the content of other similar orders entered in cases of this kind.

Because this Memorandum Opinion may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the document.   Any such redacted version shall be submitted by not later than **February 20, 2018** for review by the Court, along with an explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted).   The Court will subsequently issue a publicly-available version of its Memorandum Opinion.

Dated:  February 15, 2018

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

29